## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

THE SATANIC TEMPLE, INC., and
ADAM VAVRICK,

     Plaintiffs,

       v.

THE CITY OF CHICAGO,

     Defendant.

No. 23-cv-2780

## MOTION FOR A PRELIMINARY INJUNCTION

Plaintiffs, The Satanic Temple, Inc. and Adam Vavrick, through counsel, respectfully request that this Honorable Court grant a preliminary injunction enjoining Defendant City of Chicago from continuing its unlawful practices of excluding Plaintiffs from the opportunity to provide an invocation at a City Council meeting and vesting unconstrained discretion with City officials to decide who is permitted to deliver an invocation. In support thereof, Plaintiffs state as follows:

## INTRODUCTION

Invocations before legislative bodies are a time-honored tradition that "lend gravity to the occasion and reflect values long part of the Nation's heritage." *Town of Greece v. Galloway*, 572 U.S. 565, 583 (2014). An invocation that is "solemn and respectful in tone, that invites lawmakers to reflect upon shared ideals and common ends before they embark on the fractious business of governing," serves to "elevate the purpose of the occasion and to unite lawmakers in their common effort." *Id*.

The City of Chicago regularly takes part in the tradition of legislative prayers by opening each meeting of its City Council with an invocation delivered by a local clergy member. Plaintiffs, The Satanic Temple Inc. ("TST") and Adam Vavrick, an ordained minister of the Satanic Temple and a leader of TST's Illinois congregation, seek to take part in this tradition by delivering an invocation before a City Council meeting. For more than three years, the City has ignored Plaintiffs' requests to provide an invocation.

As shown below, the City violates the First Amendment in two ways. First, the City violates the Establishment Clause by excluding Plaintiffs from the opportunity to deliver an invocation in contravention of the non-discrimination principle articulated by the Supreme Court in *Town of Greece*. Second, the City's lack of established timeframes or criteria for deciding who is eligible to provide an invocation violates the First Amendment because it vests City officials with unbridled discretion to delay indefinitely and to engage in arbitrary and discriminatory decision-making.

## FACTUAL BACKGROUND

### I. City Council Practices

Chicago City Council routinely opens its regular and special meetings with a prayer delivered by a clergy member. In the typical invocation, a member of the clergy offers a brief prayer in which he or she asks for spiritual guidance for members of City Council as they undertake their challenging work of representing the diverse communities of the City of Chicago.

During the time period of January 2020 to April 2023, 54 invocations have been given by clergy representing a variety of faiths. Of the 54 invocations, 42 were delivered by Christian clergy members from a variety of denominations; six were delivered by a Jewish rabbi; one was delivered by a Muslim imam; and five were delivered by members of City Council.[1] *See* Exhibit 1 (list of invocations January 2020 to Present). Two clergy members—Rabbi Seth Limmer of the Chicago Sinai Congregation and Rev. Beth Brown of Lincoln Park Presbyterian Church—delivered invocations on two separate occasions. *Id*. Pastors from Park Community Church have given invocations on four different occasions. *Id*. At least one of the clergy members who has been invited to give an invocation does not reside within the City of Chicago—Chaplain Dorothy "Dee" Caldwell, of Hammond, Indiana. *Id*.

## II. The Satanic Temple, Inc. and Minister Adam Vavrick

The Satanic Temple ("TST") is a non-theistic religion, federally recognized as a church and a religious public charity. IRC §§ 170(b)(1)(A)(i); 501(c)(3). The mission of TST is to encourage benevolence and empathy among all people, reject tyrannical authority, advocate for common sense and justice, and be directed by the human conscience to undertake noble pursuits. Exhibit 2, Declaration of Vavrick, at ¶3. TST has more than half a million members located in every state (including Illinois) and internationally. *Id*. at ¶4. The Satanic Temple encourages its members to engage in civic advocacy, confront hateful, repressive and exclusionary ideologies,

---

[1]     When City Council began holding virtual meetings at the beginning of the Covid-19 pandemic, it appears that the Council temporarily stopped scheduling outside clergy to provide invocations.

3

and promote the common good in accordance with a set of core beliefs called the Seven Tenets.[2] *Id*. Members of TST do not worship Satan or believe in the existence of a literal Satan. Rather, the Satanic Temple embraces the name "Satan" as a symbol of their deeply held belief in rational inquiry removed from supernaturalism and as a metaphor for fearless pursuit of truth and questioning of dogmas.[3] *Id*. at ¶5. Members of TST have given invocations before legislative bodies in locations including San Marcos, Texas[4]; Kenai Peninsula Borough, Alaska[5]; Pensacola, Florida[6]; and Grand Junction, Colorado[7].

The Satanic Temple's Illinois Congregation ("TST-IL"), originally founded in 2016 as TST-Chicago, is a congregation in The Satanic Temple's Society of

---

[2]    The Seven Tenets are as follows: "(1) One should strive to act with compassion and empathy toward all creatures in accordance with reason; (2) The struggle for justice is an ongoing and necessary pursuit that should prevail over laws and institutions; (3) One's body is inviolable, subject to one's own will alone; (4) The freedoms of others should be respected, including the freedom to offend. To willfully and unjustly encroach upon the freedoms of another is to forgo one's own; (5) Beliefs should conform to one's best scientific understanding of the world. One should take care never to distort scientific facts to fit one's beliefs; (6) People are fallible. If one makes a mistake, one should do one's best to rectify it and resolve any harm that might have been caused; and (7) Every tenet is a guiding principle designed to inspire nobility in action and thought. The spirit of compassion, wisdom, and justice should always prevail over the written or spoken word." *See* https://thesatanictemple.com/blogs/the-satanic-temple-tenets/there-are-seven-fundamental-tenets

[3]    *See* https://thesatanictemple.com/pages/faq

[4]    *See* http://san-marcos-tx.granicus.com/player/clip/1988

[5]    *See* https://kpb.granicus.com/player/clip/779

[6]    *See* https://pensacolafl.swagit.com/play/07142016-682

[7]    *See* https://www.kjct8.com/content/news/GJ-City-Council-allows-satanic-invocation-at-meeting-438227943.html

Congregations. Its mission is to promote Satanic education, to be a force for positive change within Illinois, to provide a safe and welcoming community for marginalized members of society. Ex. 2 at ¶6.

Minister Adam Vavrick is a Chicago resident and an ordained Minister of the Satanic Temple. *Id*. at ¶1. He serves as the Co-Congregation Head of The Satanic Temple Illinois. Minister Adam has served in leadership roles for The Satanic Temple Illinois since April of 2020 and has been actively engaged with TST since 2014. *Id*. As an active member of his religious community, Minister Adam regularly ministers to TST-IL congregants at monthly services, officiates weddings for couples in Illinois and elsewhere, and actively engages with the interfaith community throughout Illinois. *Id*. at ¶8.

TST-IL has been recognized as a bona fide religious congregation by several government agencies. For example, the State of Illinois includes a contribution from TST-IL in its annual holiday display in the Illinois State Capitol Rotunda in Springfield and the Cook County Bureau of Vital Records accepts marriage licenses solemnized by TST-IL clergy. *Id*. at ¶7.

## III.    History of Plaintiffs' Efforts to Provide an Invocation

In accordance with the City's longstanding tradition of welcoming the clergy of local congregations to open meetings with a prayer, Minister Adam seeks to deliver an invocation before City Council. Ex. 2 at ¶9. He wishes to offer an uplifting message which draws on his deeply held religious beliefs and calls upon lawmakers to be guided by empathy, compassion and rationalism in their difficult jobs. *Id*.

Prior to retaining counsel to assist him with this matter, Minister Adam made numerous efforts to give an invocation through the City's normal channels for scheduling invocations. These efforts began in January 2020, when Minister Adam spoke to Chauncy Rice, who was then chief of public engagement for the Office of the City Clerk. Mr. Rice informed Minister Adam that he would be happy to schedule him to provide an invocation after "standard vetting procedures." *Id.* at ¶10. Minister Adam followed up the conversation with an email in which he provided Mr. Rice with additional information about TST and the local congregation. Mr. Rice acknowledged receipt of the information and stated that he would get back in touch with Minister Adam in the near future. *Id.* at ¶11. For the next several months, Minister Adam followed up with Mr. Rice approximately once a month to inquire about the status of his request to provide an invocation. These emails went unanswered. *Id.* at ¶12.

In August 2021, Minister Adam exchanged emails with Ariana Garcia, who replaced Mr. Rice as the chief of public engagement. In his emails he reiterated his request to provide an invocation. Ms. Garcia acknowledged receipt of his request and was initially receptive to scheduling him to provide an invocation, writing "thank you so much for your interest. We will be in touch with a confirmation on upcoming City Council invocation details." *Id.* at ¶14. But follow-up messages went unanswered. *Id.* at ¶15. In October 2021, Ms. Garcia stated that she would follow up with Minister Adam after the budget cycle, but never did so. *Id.*

In March 2022, Minister Adam again emailed Ms. Garcia, this time copying Steve Berlin, the Director of the Board of Ethics, and First Ward Alderman Daniel LaSpata, to whom he had spoken about potentially giving an invocation. In this email, Minister Adam described the history of his efforts to provide an invocation and asked for guidance about the process for scheduling. Ms. Garcia responded that she was "working on this request," but did not provide any further details regarding the timeline or process. *Id*. at ¶16.

On April 3, 2022, Ald. LaSpata sent Ms. Garcia an email in which he stated that he did not support Minister Adam's request to provide an invocation because "it would be a betrayal of [his] personal faith." Exhibit 3, Email from LaSpata. Minister Adam's follow-up emails to Ms. Garcia in May 2022 were ignored.

After submitting a FOIA request to determine what had become of his many requests to provide an invocation, Minister Adam sent an additional email to Ms. Garcia in July 2022, this time copying the various attorneys and individuals in the mayor's office to whom his previous requests had been forwarded. He received no response. Ex. 2, Decl. of Vavrick, at ¶17.

Minister Adam then retained counsel. Minister Adam and his attorney spoke to Ellen McLaughlin, an attorney in the City of Chicago's corporation counsel's Constitutional & Commercial Litigation Division, about his request to provide an invocation. *Id*. at ¶18. During calls on March 16, 2023 and March 30, 2023, counsel for the City was unable to articulate the process or criteria for selection of clergy to provide an invocation and could not say whether the City would permit Minister

Adam to deliver an invocation. *Id*.

The City has never formally rejected Minister Adam's request to provide an invocation; rather, the City has simply resisted scheduling him for more than three years. Based on the three years of delay, Plaintiffs believe that their request to deliver an invocation has been effectively denied. *Id*. at ¶19.

## ARGUMENT

### I. Preliminary Injunction Standard

To be entitled to a preliminary injunction, a plaintiff must "demonstrate (1) some likelihood of succeeding on the merits, and (2) that it has no adequate remedy at law and will suffer irreparable harm if preliminary relief is denied." *Cassell v. Snyders*, 990 F.3d 539, 544-45 (7th Cir. 2021) (citations omitted). If the plaintiff makes this threshold showing, the court proceeds to a "balancing phase" where it must then consider: (3) the balance of harms, meaning "the irreparable harm the non-moving party will suffer if preliminary relief is granted balanced against the irreparable harm to the moving party if relief is denied"; and (4) the public interest, meaning "the consequences of granting or denying the injunction to non-parties." *Id*. at 545 (citations omitted). As shown below, Plaintiffs meet each of these elements.

### II. Plaintiffs Are Likely to Succeed on the Merits of their Claim Under the Establishment Clause

Plaintiffs have a likelihood of success on their Establishment Clause claim for three reasons: (1) the City has effectively excluded them from the opportunity to deliver an invocation by indefinitely delaying a decision; (2) the evidence suggests that Plaintiffs are being excluded because of officials' disagreement with or

opposition to their beliefs; and (3) the City's exclusion of Plaintiffs from the opportunity to provide an invocation violates the Establishment Clause's requirement of non-discrimination.

## A. The City's Three-Plus-Year Delay Has Effectively Excluded Plaintiffs from the Opportunity to Provide an Invocation

As described above, the City has never formally denied Plaintiffs' request to give an invocation. Rather, it has indefinitely put off Plaintiffs' inquiry. At various times, City officials have told Minister Adam that they was "working on" his request; "vetting" TST; or simply too busy with other matters and would get back to him. The deliberations have now dragged on for more than three years without a definitive answer about whether Minister Adam may deliver an invocation. This lengthy delay amounts to *de facto* denial of the request.

The Supreme Court has repeatedly observed that excessive administrative delays in official decisions affecting speech or expression violate the First Amendment. *See Riley v. Nat'l Fed'n of Blind*, 487 U.S. 781, 802 (1988) (striking down a statute regulating charitable solicitation because it "permits a delay without limit" and "delay compels the speaker's silence."); *FW/PBS, Inc. v. Dallas*, 493 U.S. 215, 227 (1990) ("A scheme that fails to set reasonable time limits on the decisionmaker creates the risk of indefinitely suppressing permissible speech.")[8]

---

[8]    *Cf. Koch v. Vill. of Hartland*, 43 F.4th 747, 756 n.8 (7th Cir. 2022) (rejecting argument that an ordinance was constitutional because it was "temporary," writing "we fail to see how an allegedly shorter deprivation of a constitutional right has any bearing on our analysis. A suspect taken unreasonably into custody for up to four years finds little solace in the temporary nature of his unlawful seizure…. The importance of constitutional rights depends, in part, on their permanence.")

**B. Plaintiffs Are Being Excluded from the Opportunity to Provide an Invocation Based on Officials' Disagreement with TST's Beliefs**

The evidence strongly suggests that the reason for the exclusion of TST from the opportunity to deliver an invocation is intolerance or distaste for their religious beliefs. First, an email from Ald. LaSpata to Ms. Garcia in the City Clerk's office on April 3, 2022, specifically stated that he did not support Minister Adam's request to provide an invocation because "it would be a betrayal of [his] personal faith." Ex. 3, Email. Although Ms. Garcia had previously told Minister Adam that she was "working on" his request to provide an invocation, after Ald. LaSpata's email, communication from the clerk's office ceased. This suggests that Ald. LaSpata's disagreement with Plaintiffs' beliefs played a role in the City's reticence to allow Minister Adam's invocation.

Second, there is no reason to believe that there are non-discriminatory justifications for the three-plus years of administrative delay. Since Plaintiffs first began requesting to deliver an invocation in January 2020, the City has scheduled 54 invocations from clergy from 46 different congregations. Ex. 1, List of Invocations. Presumably, each clergyperson was required to go through a vetting process and obtain approval to deliver an invocation. The City has taken more than three years to consider Plaintiffs' request while approving invocations from clergy from other religions approximately twice a month. This suggests that something other than legitimate, ongoing consideration of Plaintiffs' request through normal administrative channels is afoot.

## C. The Exclusion of Plaintiffs Violates the Establishment Clause's Requirement of Non-Discrimination

### 1. The Establishment Clause Protects Minority Faiths

Religious pluralism is a founding principle of this nation. Our founders resolved that in the United States, "each individual would enjoy the right to make sense of his relationship with the divine, speak freely about man's place in creation, and have his religious practices treated with respect." *Shurtleff v. City of Bos.*, 142 S. Ct. 1583, 1608 (2022).

Throughout its Establishment Clause jurisprudence, the Supreme Court has emphasized that unpopular and unorthodox religious beliefs must be accorded the same respect and protection as mainstream and popular beliefs. *See West Virginia State Bd. of Ed. v. Barnette*, 319 U. S. 624, 642 (1943) ("If there is any fixed star in our constitutional constellation, it is that no official, high or petty, can prescribe what shall be orthodox in [matters of] religion."); *Shurtleff*, 142 S. Ct. at 1608 ("Through history, the suppression of unpopular religious speech and exercise has been among the favorite tools of petty tyrants."); *Thomas v. Review Bd. of Ind. Employment Security Div.*, 450 U. S. 707, 714 (1981) ("religious beliefs need not be acceptable,  logical, consistent, or comprehensible to others in order to merit . . . protection."). When the government picks and chooses among religions, amplifying some and excluding others from our public discourse, it betrays the ideals of the First Amendment and imperils religious liberty for all.

2. **Legislative Invocations Do Not Violate the Establishment Clause if the Opportunity to Deliver an Invocation is Made Available on a Non-Discriminatory Basis**

There has been much litigation over whether invocations before legislative bodies violate the Establishment Clause. The Supreme Court has upheld the tradition, explaining that legislative prayers occupy a unique position in the framework of Establishment Clause jurisprudence because an "unambiguous and unbroken history of more than 200 years" leaves "no doubt that the practice of opening legislative sessions with prayer has become part of the fabric of our society." *Marsh v. Chambers*, 463 U.S. 783, 792 (1983).

In its most recent case regarding legislative invocations—*Town of Greece v. Galloway*—the Court affirmed that invocations before legislative bodies do not offend the First Amendment's Establishment Clause provided that the opportunity to deliver an invocation is made available to religious congregations with a presence in the community in a non-discriminatory manner. *Town of Greece*, 572 U.S. at 585-86 ("The town made reasonable efforts to identify all of the congregations located within its borders and represented that it would welcome a prayer by any minister or layman who wished to give one."); *see also id.* at 597 (Alito, J., concurring) ("I would view this case very differently if the omission of these synagogues were intentional."); *see also Am. Legion v. Am. Humanist Ass'n*, 139 S. Ct. 2067, 2089 (2019) (the practice must stand out "as an example of respect and tolerance for differing views, an honest endeavor to achieve inclusivity and nondiscrimination, and a recognition of the important role that religion plays in the lives of many

Americans").

In *Town of Greece*, the Court upheld the Town's practice of opening its meetings with a prayer delivered by a volunteer from a local congregation and found that its criteria and process for selecting clergy to provide invocations was consistent with the Establishment Clause's requirement of non-discrimination. In particular, the Town traditionally solicited volunteers to give an invocation by calling congregations listed in the local phone book. Upon request, the Town also allowed a Jewish layman, the chairman of the local Baha'i temple, and a Wiccan priestess to deliver invocations. The Town "at no point excluded or denied an opportunity to a would-be prayer giver," and town leaders affirmed that "a minister or layperson of any persuasion, including an atheist, could give the invocation." *Id*. at 571. The Court found this selection regime acceptable, observing that "so long as the town maintains a policy of nondiscrimination, the Constitution does not require it to search beyond its borders for non-Christian prayer givers in an effort to achieve religious balancing." *Id*. at 585-86.

### 3. Decisions Applying *Town of Greece* Affirm the Requirement of Non-Discrimination in Speaker Selection

In recent years, several circuit courts of appeals have found that legislative invocation practices that exclude members of minority or disfavored faiths from the opportunity to deliver an invocation run afoul of the non-discrimination principle articulated by the Supreme Court in *Town of Greece*.

For example, in *Williamson v. Brevard Cty*., 928 F.3d 1296 (11th Cir. 2019), the Eleventh Circuit found that a county board of commissioners' method for selecting

clergy to deliver an invocation violated the Establishment Clause because it gave commissioners authority "on a rotating basis to invite whomever they want to deliver invocations, with no consistent standards or expectation of inclusiveness." *Id*. at 1299. This led to commissioners' exercising their discretion "in a way that discriminates among religions based on their beliefs, favoring some but not all monotheistic and familiar religious sects over those faiths that fall outside the 'mainstream.'" *Id*. The Eleventh Circuit explained that while "local governments have significant freedom to conduct legislative prayers at the start of their sessions … local governments violate the Constitution if they organize and conduct their prayers in a way that discriminates against other religious beliefs." *Id*. at 1310.

Similarly, in *Lund v. Rowan Cty., N.C.*, 863 F.3d 268 (4th Cir. 2017) (*en banc*), the Fourth Circuit found that a county board's practice of "lawmaker-led sectarian prayer" before board meetings violated the Establishment Clause. *Id*. at 272. The Fourth Circuit observed that because all of the Board members were Christian, Christianity was the only faith represented. Citing *Town of Greece*, the Fourth Circuit found this regime unconstitutional, noting that "[i]f the Board's practice sends the message that it prefers or accepts the teachings of one religion over others, it violates the Constitution." *Id*. at 293. The court found that the board's practice "risked conveying to citizens of minority faiths a message of exclusion." *Id*. at 272.; *see also id*. at 289 ("The ultimate criterion is simply one of conveying a message of respect and welcome for persons of all beliefs and adopting a prayer practice that advances the core idea behind legislative prayer, that people of many

14

faiths may be united in a community of tolerance and devotion.") (citations

omitted).[9]

### 4. The Seventh Circuit Has Recognized the Requirement of Non-Discrimination in the Establishment Clause Context

The Seventh Circuit has not yet had occasion to apply *Town of Greece* in the

context of legislative prayer, but has affirmed the non-discrimination principle

embodied in the decision. In *Woodring v. Jackson Cty.*, 986 F.3d 979 (7th Cir. 2021),

the Seventh Circuit found that the inclusion of a nativity scene in a holiday display

on government property along with depictions of Santa Claus and reindeer did not

violate the Establishment Clause because the display fit within "a long national

tradition of using the nativity scene in broader holiday displays to celebrate the

origins of Christmas, a public holiday." *Id.* at 981.

In so ruling, the Seventh Circuit recognized that in the Establishment Clause

context, courts are to apply a "historical approach" that asks "whether a

longstanding tradition supports a challenged governmental practice and whether

the practice fits within the tradition." *Id.* at 988 (*citing Town of Greece*, 572 U.S. at

577). The Seventh Circuit explained that "tradition" is not the sole metric for

whether a practice is constitutional. Rather, it cautioned that "a religious

monument, symbol, or practice with historical footing might still be

unconstitutional if it deviates from the historical tradition by exhibiting intolerance

---

[9]      *Compare Freedom from Religion Found., Inc. v. Mack,* 49 F.4th 941 (5th Cir. 2022)
(finding a local judge's practice of starting court with a brief prayer from a volunteer
chaplain did not violate the Establishment Clause because the judge "maintained a policy of
non-discrimination" and "members of any faith are free to participate.")

for differing views or discriminatory intent." *Id*. at 995 (*citing Am. Legion*, 139 S. Ct. at 2089; *id*. at 2091 (Breyer, J., concurring); *Town of Greece*, 572 U.S. at 577-91; *Marsh*, 463 U.S. at 790).

Here, Plaintiffs have a likelihood of success on their claim that the City's three-year delay and continued exclusion of Plaintiffs from the opportunity to deliver an invocation runs afoul of the Establishment Clause and the non-discrimination principle articulated by the Supreme Court in *Town of Greece*.

### III. The City's Procedures for Selecting Clergy to Provide Invocations Violate the First Amendment

Plaintiffs also have a likelihood of success on their claim that the City's procedures for selecting clergy to provide invocations violate the First Amendment because they do not constrain officials' discretion. The City has no standardized process whereby requests to provide invocations are considered and decided upon and no established criteria for identifying members of the clergy who are eligible to give an invocation, which violates the First Amendment in two ways. First, the lack of a standard process for the City's consideration of requests to provide an invocation allows the City to engage in *de facto* exclusion of disfavored groups through indefinite delay. Second, the lack of any standards or criteria for identifying clergy who are eligible to deliver an invocation vests unbridled discretion with City officials, creating an unreasonable risk of arbitrary decision-making.

16

## A. The Lack of any Time Constraints Invites Censorship Through Indefinite Delay

In a series of First Amendment cases, the Supreme Court has explained that policies that vest local officials with the power to decide whether particular speech is permissible must contain time constraints, lest indefinite delays become a tool for censorship.

In *Freedman v. Maryland*, 380 U.S. 51 (1965), the Supreme Court found Maryland's motion picture censorship statute unconstitutional because it lacked adequate procedural safeguards to guard against "unduly suppressing protected expression." *Id*. at 54. In particular, the procedure was flawed because it "imposed no time limit" for the censorship board to render its decision. *Id*. at 55. The Court held that for the regime to satisfy the First Amendment, the state must clearly mandate that "within a specified brief period, [the censorship board will] either issue a license or go to court to restrain showing the film." *Id*. at 59. In the absence of such limitations, protected expression could be prohibited indefinitely. *Id*.

In *Riley v. Nat'l Fed'n of the Blind of North Carolina*, 487 U.S. 781 (1988), the Supreme Court examined a statute requiring professional fundraisers to obtain a permit before soliciting charitable donations. The law did not set a time limit within which the licensor was required to decide upon permit requests. *Id*. at 802. Because of the possibility of indefinite delay, the Court found that nothing "effectively constrained the licensor's discretion," and the statute was struck down. *Id*.  Again in *FW/PBS, Inc. v. Dallas*, 493 U.S. 215 (1990), the Court affirmed that licensing schemes that regulate speech related activities must guarantee that the

17

administrative decision allowing or forbidding the speech must be forthcoming "within a short and fixed time." *Id.* at 228.[10]

Here, as in the Supreme Court's licensing cases, delay functions as a form of censorship. Because the City places no time constraints on consideration of requests to provide an invocation, City officials can, and have, suppressed unpopular or disfavored speech by indefinitely delaying a decision.

## B. The Lack of Standards or Criteria Vests City Officials with Unbridled Discretion to Determine Who May Deliver an Invocation

Relatedly, the City's policy has no established standards or criteria for determining whether a particular clergyperson is eligible to provide an invocation. The lack of standards leaves it up to the subjective judgment of city officials to decide whether a particular member of the clergy should be permitted to offer a prayer.

The courts have repeatedly cautioned that a policy that vests uncontrolled discretion with government officials to decide who may engage in speech violates the First Amendment because it creates a high risk of arbitrary and discriminatory enforcement. For example, in *DeBoer v. Vill. of Oak Park*, 267 F.3d 558 (7th Cir. 2001), organizers of "National Day of Prayer activities" in the Village of Oak Park

---

[10]   *Cf. Thomas v. Chi. Park Dist.*, 534 U.S. 316, 323-24 (2002) (content-neutral ordinance requiring individuals to obtain a permit before conducting an event involving 50 or more people in a public park was constitutional where officials were required to "process applications within 28 days, and … clearly explain [the] reasons for any denial."); *Graff v. City of Chi.*, 9 F.3d 1309, 1332 (7th Cir. 1993) ("The common danger posed by licensors not anchored by either standards or time constraints is the opportunity for the content based suppression of speech. By manipulating loose standards or by delaying action, a licensor can suppress speech of which he disapproves.")

sought to use a room in Village Hall to hold a prayer assembly. The Village denied

the request based on a policy that required, among other things, that any program

on Village Hall property must "benefit[] the public as a whole." *Id.* at 561. The

Seventh Circuit found this policy violated the First Amendment because it was too

open ended and discretionary, writing as follows:

> Any regulations governing a speaker's access to a forum must contain
> narrow, objective, and definite standards to guide a governmental
> authority, so that such regulations do not operate as a prior restraint that
> may result in censorship. Although such regulations need not have perfect
> clarity and precise guidance, the Supreme Court has struck down those that
> do not provide principled limits to guide the decisions of government
> officials.

*Id.* at 573 (citations omitted).

This decision is consistent with a long line of Supreme Court cases finding that

policies that give government officials undue discretion to decide who may engage in

speech violate the First Amendment. *See., e.g., Shuttlesworth v. Birmingham*, 394

U.S. 147, 151 (1969) (ordinance that conferred upon city officials "virtually

unbridled" discretion to decide whether to allow a parade based upon "their own

ideas of public welfare, peace, safety, health, decency, good order, morals or

convenience" violated the First Amendment because it lacked "narrow, objective,

and definite standards" and thus allowed officials to apply the law in a

"discriminatory fashion"); *Largent v. Texas*, 318 U.S. 418, 422 (1943) ("ordinances

which leave the granting or withholding of permits for the distribution of religious

publications in the discretion of municipal officers" are unconstitutional because

they allow officials to engage in "administrative censorship"); *Heffron v. Int'l Soc. of*

*Krishna Consciousness, Inc.*, 452 U.S. 640, 649 (1981) ("discretion has the potential for becoming a means of suppressing a particular point of view"); *Schall v. Martin*, 467 U.S. 253, 307 (1984) ("we have consistently held violative of the First Amendment ordinances which make the ability to engage in constitutionally protected speech contingent upon the uncontrolled will of an official") (citations omitted); *City of Lakewood v. Plain Dealer Pub. Co.*, 486 U.S. 750, 757 (1988) (ordinance vesting a government official with "unbridled discretion" "to permit or deny expressive activity" poses significant risks of "content-based censorship").

Here, the City lacks any objective criteria for identifying who is eligible to provide an invocation before City Council. In the absence of any established criteria, the City is free to exclude speakers such as Minister Adam who are deemed to be controversial, unpopular, or otherwise disfavored.

Thus, Plaintiffs have a likelihood of success on their claim that the City's practice for selecting clergy to provide an invocation violate the First Amendment because it vests City officials with excessive discretion.

## IV. Plaintiffs Will Suffer Irreparable Harm in the Absence of Injunctive Relief

Plaintiffs are suffering irreparable harm and will continue to suffer irreparable harm unless an injunction is granted. Plaintiffs have been excluded from providing an invocation before City Council on the same basis as other religious congregations in the community in violation of their First Amendment rights for more than three years. Absent preliminary relief, the City will continue to exclude Plaintiffs in violation of the First Amendment.

Harm is irreparable if it "cannot be prevented or fully rectified by the final judgment after trial." *Whitaker By Whitaker v. Kenosha Unified Sch. Dist. No. 1 Bd. of Educ.*, 858 F.3d 1034, 1045 (7th Cir. 2017) (*quoting Girl Scouts of Manitou Council, Inc. v. Girl Scouts of U.S.A., Inc.*, 549 F.3d 1079, 1089 (7th Cir. 2008)). In the First Amendment context, courts have consistently held that "[t]he loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Elrod v. Burns*, 427 U.S. 347, 373 (1976); *see also ACLU of Ill. v. Alvarez*, 679 F.3d 583, 590-91 (7th Cir. 2012) (a plaintiff who is prohibited from engaging in First Amendment protected activity successfully demonstrates irreparable injury). When deprivation of First Amendment rights is alleged, "most courts hold that no further showing of irreparable injury is necessary." *Ezell v. City of Chicago*, 651 F. 3d 684 (7th Cir. 2011) (*quoting* Alan Wright *et al.*, Federal Practice and Procedure § 2948.1 (2d ed. 1995)); *see also Brownsburg Area Patrons Affecting Change v. Baldwin*, 137 F.3d 503, 507 (7th Cir. 1998) ("[Plaintiff] lacks an adequate remedy at law as any post-election remedy would not compensate it for the loss of the freedom of speech.")

## V. The Balance of Harms Tilts in Plaintiffs' Favor

The balance of harms also strongly tilts in Plaintiffs' favor. An injunction requiring the City to comply with the non-discrimination principles articulated by the Supreme Court in *Town of Greece* and to establish clear limits on City officials' discretion would not harm the City's interests or the public interest because the City has no legitimate interest in infringing upon First Amendment rights and "it is

21

always in the public interest to protect First Amendment liberties." *Joelner v. Vill. of Washington Park,* 378 F.3d 613, 620 (7th Cir. 2004); *Christian Legal Soc'y v. Walker*, 453 F.3d 853, 859 (7th Cir. 2006) ("injunctions protecting First Amendment freedoms are always in the public interest."); *see also Alvarez*, 679 F.3d at 589-90 ("[T]he public interest is not harmed by preliminarily enjoining the enforcement of a statute that is probably unconstitutional.")

## CONCLUSION

For the reasons set forth above, Plaintiffs respectfully request that this Court grant a preliminary injunction prohibiting Defendant City of Chicago from continuing its unlawful practices of excluding disfavored minority religions from the opportunity to provide an invocation at a City Council meeting and vesting unconstrained discretion with City officials to decide who is permitted to deliver an invocation and any other relief the Court deems appropriate.

Respectfully submitted,

/s/ Adele D. Nicholas
/s/ Mark G. Weinberg
/s/ Matt Kezhaya*
*Counsel for Plaintiffs*

Law Office of Adele D. Nicholas
5707 W. Goodman Street
Chicago, Illinois 60630
(847) 361-3869
adele@civilrightschicago.com

Law Office of Mark G. Weinberg
3612 N. Tripp Avenue
Chicago, Illinois 60641
(773) 283-3913
mweinberg@sbcglobal.net

Matt Kezhaya
*pro hac vice pending
Ark. # 2014161
Minn. # 0402193
Crown Law
100 S. Fifth S., Ste. 1900
Minneapolis, MN 55402
Direct: (479) 431-6112
General: (612) 276-2216
matt@crown.law