**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| THE SATANIC TEMPLE, INC., and ADAM VAVRICK, <br><br>     Plaintiffs, <br><br>       v. <br><br> THE CITY OF CHICAGO, <br><br>     Defendant. | No. 23-cv-2780 |

**PLAINTIFFS' RESPONSE TO DEFENDANT'S MOTION TO DISMISS**

Plaintiffs, The Satanic Temple, Inc. ("TST") and Adam Vavrick, through counsel,

respond in opposition to Defendant's motion to dismiss as follows.

## INTRODUCTION

The City of Chicago opens its City Council meetings with an invocation offered

by a local clergy member. For three years, TST and Minister Adam Vavrick have

sought an equal opportunity to deliver an invocation, but the City has refused to

allow it. In its Rule 12(b)(6) motion, the City admits that it vests the City Clerk's

office with unconstrained discretion to decide who may deliver an invocation and

that it has excluded Plaintiffs from the opportunity to deliver one.[1] The City defends

its exclusion of Plaintiffs on two grounds, both of which fail.

First, the City claims that invocations are "government speech" that fall entirely

outside the protections of the First Amendment's Free Speech and Free Exercise

---

[1] A thorough explanation of the City's practices regarding selection of clergy to provide invocations and the City's exclusion of Plaintiffs is set forth in Plaintiffs' motion for a preliminary injunction. ECF 7 at 2-8.

Clauses. Def. Mot. at 3-6. Plaintiffs acknowledge that there are court opinions going in both directions. But, the better view is that legislative invocations constitute private speech because "government speech" requires government control over the message. Where, as here, the speech is religious expression, governments may not control the message without violating the Establishment Clause.

Second, the City contends that its practices do not violate the Establishment Clause because they are "consistent with historical practices" and do not "favor[] or disparage[] anyone's beliefs." Def. Mot. at 6-13. But the City's the City's practices for selecting clergy to provide invocations and its intentional exclusion of Plaintiffs from the opportunity to provide an invocation are the precise opposite of what the Establishment Clause requires. For both of these reasons, the Court should deny Defendant's motion.

## ARGUMENT

### I. Legislative Prayers Are Not Government Speech

The City claims that Plaintiffs' Free Speech/Free Exercise claim should be dismissed because "offering a religious invocation before a legislative session is government speech [that] does not implicate, let alone violate, the First Amendment." Def. Mot. at 3. The City argues that invocations are the City's "own expressive conduct" and thus beyond the reach of the Free Speech clause. *Id*. at 5. There are four principal reasons that legislative prayers are not government speech: (1) the government speech doctrine is bounded by the Establishment Clause, and governments cannot dictate prayers and cannot cherry-pick among religions

without violating the Establishment Clause; (2) an invocation is not government speech where, as here, the government does not dictate the message communicated and instead invites a variety of private speakers to express diverse viewpoints drawing on their own beliefs; (3) Defendant is arguing for an extension of the "government speech" doctrine that is inconsistent with the purposes for which the doctrine exists and invites discrimination against disfavored, minority religions in violation of the Establishment Clause; and (4) the City's authorities neither mandate nor persuasively suggest that legislative prayers are government speech.

## A. Government Speech Is Limited by the Establishment Clause

The City's motion omits that government speech is limited by the Establishment Clause. *Pleasant Grove City v. Summum*, 555 U.S. 460, 468 (2009) ("government speech must comport with the Establishment Clause"). Thus, if legislative invocations are considered to be government speech, the Establishment Clause's prohibition against disparate treatment among religious denominations and against government speech endorsing a particular religion apply with full force and effect. *Larson v. Valente*, 456 U.S. 228, 244 (1982) ("The clearest command of the Establishment Clause is that one religious denomination cannot be officially preferred over another"); *Marsh v. Chambers,* 463 U.S. 783 (1983) (invocations cannot be "exploited to proselytize or advance any one, or to disparage any other, faith or belief."); *see also Town of Greece v. Galloway*, 572 U.S. 565, 582 (2014) ("The First Amendment is not a majority rule, and government may not seek to define permissible categories of religious speech"); *Lund v. Rowan Cnty.*, 863 F.3d 268, 281

(4th Cir. 2017) (where "the prayer-giver was the state itself," the government was "elbow-deep in the activities banned by the Establishment Clause—selecting and prescribing sectarian prayers.")

## B. A Message Communicated by a Private Speaker Is Not Government Speech Unless the Government Controls the Message

Whereas the Establishment Clause prohibits government from selecting and prescribing prayers, application of the government speech doctrine relies on a finding that the speech is subject to "active control" by the government. *Shurtleff v. City of Bos.*, 142 S. Ct. 1583, 1592 (2022). The Supreme Court's government speech cases make clear that in order to be considered "government speech" the government must exercise significant editorial control over the message communicated:

- *Shurtleff*, 142 S. Ct. at 1592: Flags displayed on a city flagpole did not constitute government speech because the city permitted a diverse variety of private civic groups to display flags and did not "actively … shape[] the message the flag sent."

- *Matal v. Tam*, 582 U.S. 218, 235 (2017): registered trademarks are not government speech because "[t]he Federal Government does not dream up these marks, and it does not edit marks submitted for registration."

- *Walker v. Texas Div., Sons of Confederate Veterans, Inc.*, 576 U.S. 200, 213 (2015): specialty license plates were government speech where the plates are manufactured, owned, and designed by the state, and the state "maintain[ed] direct control over the messages conveyed on its specialty plates."

- *Summum*, 555 U.S. at 472-73: permanent monuments in a city park were government speech because the city "effectively controlled the messages sent by the monuments in the park" and "selected those monuments that it wants to display for the purpose of presenting the image of the City that it wishes to project to all who frequent the park."

- *Johanns v. Livestock Marketing Assn.*, 544 U.S. 550, 562 (2005): a beef

marketing campaign was government speech because "the government sets the overall message to be communicated and approves every word that is disseminated."[2]

Because the predicate for government speech is government control of the message, and because the Establishment Clause prohibits government control of legislative prayers, legislative prayers cannot be regarded as government speech. *See Town of Greece*, 572 U.S. at 586 ("The quest to promote a diversity of religious views would require the town to make wholly inappropriate judgments about the number of religions it should sponsor and the relative frequency with which it should sponsor each.") Indeed, in sharp contrast to its government speech cases, wherein the Court emphasized government control of the message as the hallmark of government speech, the Court in *Galloway* explained that the hallmark of a constitutional legislative invocation practice is that the government *does not* exercise editorial control over the message. Rather, the individual delivering the invocation must be permitted to deliver a message consistent with the dictates of his or her own faith and conscience. The Court wrote that "Once it invites prayer into the public sphere, government must permit a prayer giver to address his or her own God or gods as conscience dictates, unfettered by what an administrator or judge considers to be nonsectarian." *Galloway*, 572 U.S. at 582. This suggests that legislative invocations are not subject to the kind of close government control that

---

[2]    *Cf. Adler v. Duval County School Board*, 250 F.3d 1330, 1341 (11th Cir. 2001) ("What turns private speech into state speech in this context is, above all, the additional element of state control over the content of the message."

the Court has deemed necessary for a private citizen's speech to fall within the government speech doctrine.

Moreover, nothing in the record indicates that the City exercises control over the contents of invocations before City Council in the manner that the Supreme Court has deemed sufficient to transform private expression into government speech. Rather, it is evident from the diverse messages conveyed by clergy who have given invocations that the City has not dictated their contents. *Compare*, February 23, 2022, invocation of Rev. Edward R. Williams III, Metropolitan Missionary Baptist Church ("I am weak, but thou art mighty. Hold us with your powerful hand, God of love, justice and mercy. Dear God, this morning we ask for godly wisdom for every person in this room … We ask for a spirit of unity that sweeps across this body that will break the barriers of race, class, unbiblical and ungodly ideologies.")[3]; and October 14, 2021, invocation of Rabbi David Wolkenfeld of Anshe Sholom B'nai Israel ("God on high, Jeremiah your profit taught us … when you find yourself in a city, you need to pray.")[4].

Based on the diversity of messages conveyed by those who give invocations, it appears that the City's practice resembles the practice at issue in *Shurtleff*, where the city approved a variety of private groups to display flags that communicated messages of their choice without direct editorial control by the government.

---

[3]   *See* Video of Council Meeting, https://www.youtube.com/watch?v=fozpd7N_Or0

[4]   *See* Video of Council Meeting, https://www.youtube.com/watch?v=NIObJZFOfdk

In sum, legislative prayers delivered by private citizens with discretion to pray as their conscience dictates have the indicia of private expression. It cannot be decided at the motion to dismiss stage that the City has exercised the type of direct editorial control over invocations that has been found sufficient to render a message "government speech" under Supreme Court precedents.

### C. The City Is Arguing for an Expansion of the Government Speech Doctrine that Goes Beyond Its Proper Bounds

The policy underlying the "government speech" doctrine is that the government must be able to communicate a consistent and coherent message to advance permissible government goals. As the court explained in *Walker*, the government must be able to decide what messages it conveys—and doesn't convey—in order to do its job:

> How could a city government create a successful recycling program if officials, when writing householders asking them to recycle cans and bottles, had to include in the letter a long plea from the local trash disposal enterprise demanding the contrary? How could a state government effectively develop programs designed to encourage and provide vaccinations, if officials also had to voice the perspective of those who oppose this type of immunization? It is not easy to imagine how government could function if it lacked the freedom to select the messages it wishes to convey.

576 U.S. at 207-08 (internal citations omitted).

Accordingly, the interest underpinning the "government speech" doctrine—that is, the government's ability to deliver a consistent message to advance its own policies or programs—simply are not implicated where, as here, the government invites a variety of private speakers to express diverse viewpoints rather than espouse a coherent message in support of a government policy or program.

*Compare, Matal*, 582 U.S. at 236 ("If the federal registration of a trademark makes the mark government speech, the Federal Government is babbling prodigiously and incoherently. It is saying many unseemly things. It is expressing contradictory views.").

Worse than simply "babbling prodigiously and incoherently" on matters of faith, if legislative prayers are categorized as government speech, then governments would be given free rein to affix a "government seal of approval" on favored faiths and "silence or muffle the expression" disfavored faiths. *Matal*, 582 U.S. at 235. To avoid this, the *Matal* Court explicitly directed courts to "exercise great caution before extending our government-speech precedents." *Id*.

Here, extending the "government speech" doctrine to invocations before City Council would advance none of the legitimate goals for which the doctrine was established and would invite discriminatory censorship of disfavored or unpopular views.[5] The Court should decline to extend government-speech precedent into a category of speech which is "by definition

---

[5]    Because of the risk of misuse of the "government speech" doctrine as a means of suppression of unpopular or disfavored viewpoints, several members of the Supreme Court have advocated for altering the test for determining whether particular private speech is properly deemed to be governmental. *See Shurtleff*, 142 S. Ct. at 1595-99 (Kavanaugh, J., concurring) ("To prevent the government-speech doctrine from being used as a cover for censorship, courts must focus on the identity of the speaker. The ultimate question is whether the government is actually expressing its own views or the real speaker is a private party and the government is surreptitiously engaged in the regulation of private speech. … [T]he real question is not whether a form of expression is usually linked with the government but *whether the speech at issue expresses the government's own message*.") (emphasis added).

religious." *American Legion v. American Humanist Association*, 139 S.Ct.

2067, 2087 (2019).

### D. There Is No Controlling Authority Holding that Invocations Are Government Speech

The two cases that the City of Chicago cites in support of its argument that

invocations are government speech do not support dismissal. *See Fields v. Speaker*

*of the Pa. House of Representatives*, 936 F.3d 142 (3d Cir. 2019); *Gundy v. City of*

*Jacksonville*, 50 F.4th 60 (11th Cir. 2022). This Court is not bound by these

decisions, and Plaintiffs believe that these cases represent a mistaken extension of

the government speech doctrine.

*Fields* disregards the *Matal* Court's directive to "exercise great caution before

extending our government-speech precedents." *Matal*, 582 U.S. at 235. The decision

invites discrimination against disfavored minority religions rather than furthering

the requirement that a legislative prayer "stands out as an example of respect and

tolerance for differing views, an honest endeavor to achieve inclusivity and

nondiscrimination, and a recognition of the important role that religion plays in the

lives of many Americans." *American Legion*, 138 S.Ct. at 2089.

*Fields* does not address the purpose for which the government-speech doctrine

was established as articulated by the Court in *Matal* and *Walker*. Nor does the

*Fields* court identify any credible policy goal advanced by the government's

discriminating between religions. To the contrary, *Fields* turned on the court's

concern that a requirement of nondiscrimination could provide "a heckler's veto to

voices on the fringe." *Fields*, 936 F.3d at 157. The notion of nondiscrimination

constituting a "heckler's veto" is anathema to Establishment Clause jurisprudence. *Kennedy v. Bremerton School District*, 142 S.Ct. 2407, 2427 (2022) ("the Establishment Clause does not include anything like a modified heckler's veto, in which religious activity can be proscribed based on perceptions or discomfort.") (cleaned up). Quite contrary to the outcome in *Fields*, the Supreme Court has held that "learning how to tolerate speech or prayer of all kinds is 'part of learning how to live in a pluralistic society,' a trait of character essential to 'a tolerant citizenry.'" *Id.*, 142 S.Ct. at 2430; *see also American Legion*, 138 S.Ct. at 2089 (noting that religion plays an important role in the lives of "many Americans").

Dealing with *Gundy* is more straightforward because, there, the court recognized that the determination of whether a particular form of private expression in a government-sponsored forum constitutes government speech requires a "fact intensive" inquiry which is difficult to make based on a limited record at the motion to dismiss stage. *See Gundy*, 50 F.4th at 76 (*citing Cambridge Christian Sch., Inc. v. Fla. High Sch. Ath. Ass'n*, 942 F.3d 1215, 1223 (11th Cir. 2019)). This case is no better situated than *Gundy* for a pleadings stage judgment that invocations constitute government speech. *See Chaidez v. Ford Motor Co.*, 937 F.3d 998, 1004 (7th Cir. 2019) (noting the "all reasonable inferences" canon of construing complaints at the Rule 12(b)(6) stage).

Contrary to the City's claim, there is no controlling authority holding that legislative invocations constitute government speech. *See* Def. Mot. at 1 (claiming that "the Seventh Circuit has held [that] legislative prayer is government speech.").

The Seventh Circuit case Defendant cites did not so hold. In *Ctr. for Inquiry, Inc. v. Marion Cir. Ct. Clerk*, 758 F.3d 869 (7th Cir. 2014), the Seventh Circuit held that an Indiana statute that permitted religious officials to solemnize marriages but prohibited equivalent officials of secular groups from solemnizing marriages violated the Equal Protection Clause and the First Amendment. In passing and without any legal analysis, the Seventh Circuit rejected Indiana's reliance on *Marsh v. Chambers*, 463 U.S. 783 (1983), and *Town of Greece v. Galloway*, 572 U.S. 565 (2014), stating that those cases "concern the long-established practice of opening legislative meetings with prayer. That is to say, they concern what a chosen agent of the government says as part of the government's own operations." *Ctr. for Inquiry, Inc.*, 758 F.3d at 874. That quotation comprises the sum total of the Seventh Circuit's discussion of legislative invocations in *Ctr. For Inquiry*. The decision contains no analysis of the government-speech doctrine; no citation to any of the pertinent government-speech cases discussed above; and no reference to the purposes for which the government-speech doctrine exists. The off-hand comment about government speech is not the holding of the case, but pure dicta and is not binding on this Court.[6] The City offers no controlling authority to support its proposition that legislative prayers are, by definition, government speech. The Court should deny the City's motion and permit discovery on the fact issue of whether, and to what extent, Chicago exercises active control over invocations.

---

[6]   Dicta is "a statement in a judicial opinion that could have been deleted without seriously impairing the analytical foundations of the holding—that, being peripheral, may not have received the full and careful consideration of the court that uttered it." *United States v. Crawley*, 837 F.2d 291, 292 (7th Cir. 1988).

For all of these reasons, Defendant's motion to dismiss based on the "government speech" doctrine should be rejected.

## II. Plaintiffs Have Stated a Claim that the City's Practices Violate the Establishment Clause

Turning to Plaintiffs' Establishment Clause claim, the City argues that its legislative invocation practices are "consistent with historical practices approved by the Supreme Court" (Def. Mot. at 6) and that Plaintiffs' complaint "does not allege that the invocation practice has favored or disparaged anyone's faith or beliefs" (*id.* at 10). For the reasons set forth below, both arguments fail.

### A. Discretionary Speaker-Selection Regimes that Are Used to Discriminate Against Disfavored Faiths Violate the Establishment Clause Under the Supreme Court's 'History and Traditions' Analysis

As set forth in Plaintiffs' motion for a preliminary injunction (ECF 7 at 11-16), the Supreme Court has upheld the practice of invocations before government bodies because an "the practice of opening legislative sessions with prayer has become part of the fabric of our society." *Marsh v. Chambers*, 463 U.S. 783, 792 (1983). In *Town of Greece*, the Court affirmed that invocations offered by volunteer chaplains before legislative bodies do not offend the First Amendment's Establishment Clause, even if the prayers offered are "sectarian." *Town of Greece*, 572 U.S. at 585-86.

Citing *Marsh* and *Town of Greece*, Defendant argues that Plaintiffs' Establishment Clause claim should be dismissed because the City's practices for selecting clergy to offer invocations are consistent with historical practices upheld by the Supreme Court and other circuit courts. Def. Mot at 6-10. In particular, the City points to historical legislative prayer practices such as the first congress'

employment of an official chaplain and the Nebraska state legislature's practice of opening legislative sessions with a prayer by a Presbyterian minister and argues that its practices are "not out of step with historical tradition" and may in fact be "more inclusive than those the Supreme Court and circuit courts have approved." *Id.* at 10.[7] But this argument ignores well established constitutional constraints imposed on the process whereby government units select who can and cannot offer an invocation.

As the Court explained in *Town of Greece*: "*Marsh* must not be understood as permitting a practice that would amount to a constitutional violation if not for its historical foundation." *Town of Greece*, 572 U.S. at 576. Under the Supreme Court's "history and traditions" analysis of legislative prayers, legislative bodies have latitude to open their meetings with a prayer, but a "policy or practice of discriminating against minority faiths" violates the Establishment Clause. *Id.* at 573; *see also Am. Legion v. Am. Humanist Ass'n*, 139 S. Ct. 2067, 2089 (2019) (the practice must stand out "as an example of respect and tolerance for differing views, an honest endeavor to achieve inclusivity and nondiscrimination, and a recognition of the important role that religion plays in the lives of many Americans").

Indeed, in *Town of Greece,* the Supreme Court specifically stated that the reason the Town's practice of opening its meetings with a prayer from a local volunteer was

---

7    The City argues that its practices are "more inclusive than those the Supreme Court and circuit courts have approved" because it has permitted invocations from "Christian, Jewish, Muslim and Buddhist congregations." *See* Def. Mot. at 9-10. Nothing in the record establishes that the City has ever had a Buddhist provide an invocation and the City does not cite a source for this claim. *Id.*

constitutional was that the Town "maintains a policy of nondiscrimination" and "would welcome a prayer by any minister or layman who wished to give one." 572 U.S. at 586. The Court pointed out that the Town "at no point excluded or denied an opportunity to a would-be prayer giver," including an atheist (*id*. at 571) and nothing in the Town's speaker-selection regime reflected "an aversion or bias on the part of town leaders against minority faiths." *Id*. at 586. Justice Alito's concurrence underscored the relevance of motive and selection procedures in evaluating whether the Town's practices violated the Establishment Clause. *See id*. at 594-97 (Alito. J., concurring). He observed that the Town leaders had made an honest mistake in failing to realize that many residents attended synagogues just outside the city limits and that the leaders of those congregations ought to have been on list of clergy eligible to give invocations. *Id*. at 596. This did not require invalidation of the prayer regime, but the case would have been viewed "very differently if the omission of these synagogues were intentional." *Id*. at 597.

The Seventh Circuit has affirmed that "tradition" is not the sole metric for whether a practice is constitutional under the Establishment Clause. Rather, it cautioned that "a religious monument, symbol, or practice with historical footing might still be unconstitutional if it deviates from the historical tradition by exhibiting intolerance for differing views or discriminatory intent." *Woodring v. Jackson Cty*., 986 F.3d 979, 995 (7th Cir. 2021) (citing *Am. Legion v. Am. Humanist Ass'n*, 139 S. Ct. 2067, 2089 (2019), *id*. at 2091 (Breyer, J., concurring); *Town of Greece*, 572 U.S. at 577-91; *Marsh*, 463 U.S. at 790).

14

Here, the City's practices are a far cry from those upheld in *Town of Greece*. The City does not maintain "a policy of nondiscrimination." Instead, it gives government officials unbridled discretion to exclude disfavored minority religions. *See* ECF 1, Complaint at ¶¶4, 32-34. The evidence suggests that the City has exercised its unbridled discretion to exclude Plaintiffs based on City Council members' disapproval of their beliefs. Specifically, in response to Minister Adam's email expressing interest in providing an invocation, Ms. Garcia in the City Clerk's office responded, "Thank you so much for your interest. We will be in touch with a confirmation on upcoming City Council invocation details." ECF 7-2 at 11 (August 31, 2021, email from Ariana Garcia). But after Ald. Daniel LaSpata sent Ms. Garcia an email in which he stated that he did not support Minister Adam's request to provide an invocation because "it would be a betrayal of [his] personal faith" (ECF 7-3, Email from LaSpata), Ms. Garcia stopped responding to Minister Adam's emails. In the absence of any standards or criteria constraining the clerk's office's discretion, it appears that Ald. LaSpata's expression of personal aversion to Plaintiffs' beliefs ended the City's consideration of whether Plaintiffs could provide an invocation.[8]

---

[8]    The City claims that it "does not solicit, accept or deny applications to deliver invocations" and characterizes TST's request to deliver an invocation as "unusual." Def. Mot. at 12. But Ms. Garcia's response to Minister Adam, in which she thanked him for his interest and promised to be in touch soon with "confirmation on upcoming City Council invocation details" belies this claim. *See* ECF 7-2 at 11. Discovery will reveal further information about how the City handles requests to deliver invocations, how it decides who is eligible to deliver an invocation, and how it selects clergy to invite.

This case bears a striking resemblance to *Williamson v. Brevard Cty.,* 928 F.3d 1296 (11th Cir. 2019), where the Eleventh Circuit invalidated a county board of commissioners' method for selecting clergy to deliver an invocation. The board's process gave commissioners authority "on a rotating basis to invite whomever they want to deliver invocations, with no consistent standards or expectation of inclusiveness." *Id*. at 1299. This led to commissioners' exercising their discretion "in a way that discriminates among religions based on their beliefs, favoring some but not all monotheistic and familiar religious sects over those faiths that fall outside the 'mainstream.'" *Id*. The Eleventh Circuit explained that while "local governments have significant freedom to conduct legislative prayers at the start of their sessions … local governments violate the Constitution if they organize and conduct their prayers in a way that discriminates against other religious beliefs." *Id*. at 1310. Noting that commissioners' decisions about whom to invite and whom to exclude were motivated by their "views about which religions and types of religious beliefs were the right kind for invocations and which were not," the court held that the practice was unconstitutional under *Marsh* and *Town of Greece*. *Id*. (citing *Marsh,* 463 U.S at 794-95; *Town of Greece*, at 585). The same result is appropriate here.

The City's argument that its policy is consistent with the history and tradition of legislative prayer is not helped by the fact that at least one court has upheld a "theists-only" policy. *See* Def. Mot. at 8 (*citing Barker v. Conroy*, 921 F.3d 1118, 1128–32 (D.C. Cir. 2019)). First, it is doubtful that such a policy would pass constitutional muster in this jurisdiction. *See Ctr. for Inquiry*, 758 F.3d at 873 ("The

Supreme Court also has forbidden distinctions between religious and secular beliefs that hold the same place in adherents' lives.") (*citing, inter alia, Welsh v. United States*, 398 U.S. 333 (1970) (serious and sincere moral system must be treated the same as theistic religion for the purpose of conscientious objection); *Kaufman v. McCaughtry*, 419 F.3d 678 (7th Cir. 2005) (when making accommodations in prisons, states must treat atheism as favorably as theistic religion); and *Torcaso v. Watkins*, 367 U.S. 488, 495 (1961) (secular humanism must be treated the same as religion)). But, more importantly, the City hasn't established a generally applicable policy requiring that those selected to give invocations have theistic beliefs. It lets the clerk's office do whatever it wants, including discriminating against minority religions based on an alderperson's personal distaste for their beliefs.[9]

For all of these reasons, the City's motion to dismiss based on the "history and traditions" analysis under *Marsh* and *Town of Greece* should be rejected.

---

[9]    Likewise, the City isn't helped by its suggestion that it "makes sense" for the City to select clergy from larger or longer established religious congregations, such as those that have "brick-and-mortar" locations. Def. Mot. at 12, n.4. One, such a policy could serve as a convenient guise for discrimination against small and unorthodox faiths. *See, e.g., Shurtleff*, 142 S. Ct. at 1608 ("Through history, the suppression of unpopular religious speech and exercise has been among the favorite tools of petty tyrants."); *Larson v. Valente*, 456 U.S. 228, 245 (1982) ("legislators—and voters—are required to accord to their own religions the very same treatment given to small, new, or unpopular denominations."). But more importantly, the City hasn't established a policy requiring that clergy selected to provide invocations have a certain number of congregants, have been around for a certain number of years, or have a brick-and-mortar location. Rather, the City leaves selection of invocators to the unconstrained whim of government officials, who have exercised that discretion to exclude Plaintiffs on the basis of disagreement with their beliefs.

**B. The City's Practices Violate the Establishment Clause's Prohibition on Government Speech Endorsing a Particular Religion or Denigrating Non-Believers**

The City argues that Plaintiffs' Establishment Clause claim should be dismissed because "nothing in the complaint suggests the City Council's invocation practice has been exploited to advance or disparage anyone's faith or belief." Def. Mot. at 10.

As discussed fully below, this argument fails for two reasons—first, because at the motion to dismiss stage, there is insufficient evidence to conclude that invocations before the City Council do not impermissibly denigrate non-believers or impermissibly promote certain religious beliefs; and second, because even if the invocations themselves do not contain discriminatory content, discriminatory selection procedures violate the Establishment Clause.

**1. Invocations Before City Council Must Be Viewed 'As a Whole' Before the Court Can Determine Whether they Have Been Used to Impermissibly Foster Certain Beliefs and Denigrate Others**

In *Town of Greece*, the Court explained that the "tradition reflected in *Marsh* permits chaplains to ask their own God for blessings of peace, justice, and freedom that find appreciation among people of all faiths." *Town of Greece*, 572 U.S. at 583. While "passing reference to religious doctrine" does not remove a prayer from the tradition upheld in *Marsh*, prayers must not be "exploited to proselytize or advance any one, or to disparage any other, faith or belief." *Id.* (*citing Marsh*, 463 U.S., at 794-795); *see also Lund v. Rowan Cty., N.C.*, 863 F.3d 268, 277 (4th Cir. 2017) ("the Establishment Clause does not countenance prayers that denigrate nonbelievers or religious minorities, threaten damnation, or preach conversion or … prayers that

18

proselytize or advance or disparage a particular faith."). The Court explained that courts should conduct "an inquiry into the prayer opportunity as a whole, rather than into the contents of a single prayer" to determine whether the practice is consistent with the tradition of legislative prayer upheld in *Marsh*. *Town of Greece*, 572 U.S. at 585 (*citing Marsh*, 463 U.S., at 794-95).

At this early stage in the case, the publicly available evidence demonstrates that some invocations before City Council are surely consistent with the tradition of legislative prayer that has been upheld by the Court.[10] Other invocations, however, depart from this tradition by explicitly endorsing a particular religious viewpoint and denigrating those who do not share their beliefs. For example, in a February 23, 2022, invocation offered by Rev. Edward R. Williams III, Metropolitan Missionary Baptist Church, the invocator explicitly called for "godly wisdom that will sweep across this august body that will break the barriers of … unbiblical and ungodly ideologies." (https://www.youtube.com/watch?v=fozpd7N_Or0). In his December 14, 2022, invocation before City Council, Bishop James C. Austin, Sr. of St. Luke Church of God in Christ recited the Lord's Prayer and then prayed as follows:

> We come to you, Dear Lord, because you are the only one with power and riches and wisdom and strength and honor and glory and blessings which we so desperately need. It is you who made us. We are your people, the sheep of your pasture.

---

[10] *See, e.g.*, October 27, 2021, invocation of Rev. Charlene Hill asking for "wisdom as we make tough decisions in this meeting; remind us in heated moments that … we are on the same team.") (https://www.youtube.com/watch?v=AyBhMtxyE1Q); October 29, 2021, invocation of Pastor Myron McCoy (asking for guidance to help members of City Council "see what they can achieve, reach beyond themselves, and engage in deliberative and constructive dialogue.") (https://www.youtube.com/watch?v=JtoiLgBaKEI).

Invocation of Bishop James C. Austin, Sr., December 14, 2022

(https://www.youtube.com/watch?v=1TJ58TrKfvI).

Discovery is necessary for the Court to evaluate the extent to which, as a whole, invocations before City Council are consistent with the tradition approved in *Marsh* or, conversely, the extent to which they endorse particular religious views and denigrate nonbelievers. *See Town of Greece*, 572 U.S. at 585. Thus, it would be premature to dismiss the complaint at this stage.

In addition, the City's argument that legislative invocations should be deemed to be "government speech" further calls into question whether such prayers are consistent with the Establishment Clause. *See, e.g., Lund*, 863 F.3d at 272 (practice of sectarian prayers delivered by lawmakers violated the Establishment Clause where "The prayer practice served to identify the government with Christianity and risked conveying to citizens of minority faiths a message of exclusion.") While sectarian prayers delivered by private citizens are protected by the First Amendment, prayers endorsing a particular religious viewpoint are suspect when delivered by the government itself. *See Good News Club v. Milford Central School*, 533 U.S. 98, 111 (2001) (the religious viewpoints offered by a student club on school property was protected free speech); *Santa Fe Independent School Dist. v. Doe*, 530 U.S. 290, 302 (2000) (the Establishment Clause "forbids" government speech endorsing a particular religion). As the Supreme Court explained in *Bd. of Ed. of Westside Community Schools v. Mergens*: "[T]here is a crucial difference between government speech endorsing religion, which the Establishment Clause forbids, and

20

private speech endorsing religion, which the Free Speech and Free Exercise Clauses protect." 496 U.S. 226, 250 (1991).

### 2. Even if Invocations Before City Council Do Not Contain Evidence of Intent to Discriminate Against Certain Beliefs, Discriminatory Selection Regimes Still Violate the Establishment Clause

Finally, the City's motion to dismiss fails because even if the evidence ultimately shows that its invocation practice does not, on the whole, been used to proselytize or denigrate nonbelievers, the City's discriminatory practices for selecting clergy to provide invocations can still be held to violate the Establishment Clause. As the Eleventh Circuit observed in *Williamson*: "[t]he fact that there is little to no evidence of discriminatory content in the invocations actually given in Brevard County cannot save the speaker selection procedure as it stands today. … The Establishment Clause provides no safe harbor based on end results because an impermissible motive in the selection process may taint the whole scheme." 928 F.3d at 1315.

For all of these reasons, Defendant's motion to dismiss Plaintiffs' Establishment Clause claim should be denied.

### CONCLUSION

For the reasons set forth above, Plaintiffs respectfully request that this Court deny Defendant's motion to dismiss.

Respectfully submitted,

/s/ Adele D. Nicholas
/s/ Mark G. Weinberg
/s/ Matt Kezhaya
*Counsel for Plaintiffs*

Law Office of Adele D. Nicholas
5707 W. Goodman Street
Chicago, Illinois 60630
(847) 361-3869
adele@civilrightschicago.com

Law Office of Mark G. Weinberg
3612 N. Tripp Avenue
Chicago, Illinois 60641
(773) 283-3913
mweinberg@sbcglobal.net

Matt Kezhaya
Ark. # 2014161
Minn. # 0402193
Crown Law
100 S. Fifth S., Ste. 1900
Minneapolis, MN 55402
Direct: (479) 431-6112
General: (612) 276-2216
matt@crown.law