IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION

| | |
|---|---|
| THE SATANIC TEMPLE, INC., and ADAM VAVRICK, <br><br> Plaintiffs, <br><br> v. <br><br> CITY OF CHICAGO, <br><br> Defendant. | Case No. 23-cv-2780 <br><br> Hon. Joan H. Lefkow |

### CITY OF CHICAGO'S REPLY IN FURTHER SUPPORT OF ITS MOTION TO DISMISS THE COMPLAINT

Defendant City of Chicago respectfully submits this reply in further support of its Motion to Dismiss the Complaint of Plaintiffs The Satanic Temple, Inc. and Adam Vavrick (together, "TST") under Federal Rule of Civil Procedure 12(b)(6).

### ARGUMENT

TST challenges the City's longstanding practice of selecting clergy from a wide range of religious institutions to deliver invocations before Chicago City Council meetings. The City moved to dismiss TST's Complaint because legislative prayer is government speech, and as such, the government may select invocators and invocations as part of its own free speech. And because the City's invocations comport with longstanding practice dating back to the First Congress, and TST alleges no facts suggesting the invocations have been used to proselytize or to disparage those of other faiths, the City's practices comport with the Establishment Clause.

In opposing the City's motion, TST asks this Court to do what no court in any case it cites has done: hold that legislative invocations are not government speech and order a government entity to create a binding policy to select invocators. Acceding to that demand would infringe on the City's right to select invocators and thereby select the content of its own speech.

Such relief is neither legally supported nor appropriate here, where TST's own allegations establish that the City's processes align with historical precedent upheld by the Supreme Court and thus comply with the Establishment Clause — which is the only limit on the government speech at issue. For the reasons explained below and in the City's Motion, TST's Complaint should be dismissed.

I.  **Invocations Before The City Council Are Government Speech Because The City Exercises Total Control Over The Opportunity to Provide One.**

As the City explained, invocations are government speech, which means the City may use its discretion to choose invocators, without allowing anyone who wishes to deliver a prayer to apply to do so. (Motion to Dismiss at 4–6.) In opposing the City's Motion to Dismiss, TST makes the startling argument that the selection of speakers to deliver legislative invocations is not government speech and that the City's argument extends the doctrine beyond its "proper bounds." (Resp. at 8.) But TST's contentions defy the clear weight of judicial authority. Notably, TST fails to cite a single decision holding that the choice of invocators is not government speech. To the contrary, every federal court to consider this issue has concluded that legislative invocations qualify as government speech, even when delivered by a variety of private speakers. *See, e.g.*, *Simpson v. Chesterfield Cty. Bd. of Sup'rs*, 404 F.3d 276, 288 (4th Cir. 2005) (concluding that a county board's practice of inviting invocations from leaders of local congregations constitutes government speech); *Fields v. Speaker of Pennsylvania House of Representatives*, 936 F.3d 142, 158–59 (3d Cir. 2019) (concluding that a "legislative prayer, even one offered by a guest chaplain," constitutes government speech); *Gundy v. City of Jacksonville*

*Fla.*, 50 F.4th 60, 80 (11th Cir. 2022) (holding that a pastor's "invocation before the City Council is government speech"), *cert. denied*, 143 S. Ct. 790 (2023).[1]

Importantly, the Seventh Circuit has joined this unanimous chorus in concluding that legislative invocations constitute government speech. *See Center for Inquiry, Inc. v. Marion Cir. Ct. Clerk*, 758 F.3d 869, 874 (7th Cir. 2014). TST invites this Court to disregard the Seventh Circuit's analysis as "pure dicta." (Resp. at 11.) But as the Supreme Court has instructed, courts are bound not only by the result of a precedential opinion but also by "those portions of the opinion necessary to that result." *Seminole Tribe of Fla. v. Fla.*, 517 U.S. 44, 67 (1996). And in *Center for Inquiry*, the Seventh Circuit's conclusions regarding legislative prayer were indispensable to the result reached. There, the State of Indiana sought to defend its practice of permitting religious leaders, but not leaders of secular organizations, to solemnize marriages. In doing so, it invoked the Supreme Court's decision upholding legislative prayer in *Marsh v. Chambers*, 463 U.S. 783 (1983). The Seventh Circuit rejected Indiana's argument that *Marsh* applied, because, unlike solemnizations at private wedding ceremonies, legislative invocations "concern what a chosen agent of the government says as part of the government's own operations." 758 F.3d at 874. Thus, the Seventh Circuit's observation that legislative invocations are government speech was no mere off-hand comment, as TST contends, but necessary to reject a central argument advanced by the appellee and to reach the holding in *Center for Inquiry*.

TST further argues that invocations before the City Council cannot constitute government speech if the City does not exercise "significant editorial control over the message communicated." (Resp. at 4.) But no authority holds that a government body must pick and choose each word of a communication for that communication to constitute government speech.

---

[1] *See also Coleman v. Hamilton Cty.*, 104 F. Supp. 3d 877, 891 (E.D. Tenn. 2015); *Bormuth v. Cty. of Jackson*, 116 F. Supp. 3d 850, 853 (E.D. Mich. 2015), *aff'd*, 870 F.3d 494 (6th Cir. 2017).

To the contrary, a government body's control over the message can be established simply by selecting which private speakers are permitted to speak in a setting closely associated with the government. *Pleasant Grove City v. Summum*, 555 U.S. 460 (2009), illustrates this. There, the Court held that government speech existed where a municipality decided which monuments private groups or individuals could place in a public park that the city controlled, even though the city did not craft or dictate the messages the monuments conveyed. *Id.* at 470–72. Additionally, the Court emphasized the importance of the fact that "[p]ublic parks are often closely identified in the public mind with the government unit that owns the land." *Id*. at 472. Likewise, in this case — where, as TST alleges, the City exercises total control over which speakers may deliver invocations before the City Council, in proceedings "closely identified in the public mind" with the City — invocations plainly constitute government speech.

      No case TST cites compels a contrary conclusion. For example, *Shurtleff v. City of Boston*, 142 S. Ct. 1583 (2022), is readily distinguishable. There, the Supreme Court held that Boston's practice of permitting private groups to fly flags on a city flagpole was not government speech. But this was because (1) Boston exercised essentially no control over access to the flagpole, insofar as it "approve[d] flag raisings, without exception," and (2) the public had little reason to associate the practice with the city, because "Boston allowed its flag to be lowered and other flags to be raised" in its place. *Id*. at 1591–92. Here, in contrast, the City exercises total control over which invocators are selected, and City Council invocations are recognized as

official City activity. TST also cites several inapposite cases from disparate contexts.[2] Finally, TST suggests that *Town of Greece v. Galloway*, 572 U.S. 565 (2014), somehow stands for the proposition that invocations are not government speech. (Resp. at 5.) But nothing in *Town of Greece* so holds and, again, the Seventh Circuit has interpreted the Supreme Court's decisions upholding legislative prayer in *Marsh* and *Town of Greece* as addressing government speech. *See Center for Inquiry*, 758 F.3d at 874 (characterizing decisions as addressing what a "chosen agent of the government says as part of the government's own operations").

Lastly, TST contends that discovery is necessary "on the fact issue of whether" legislative invocations before the City Council constitute government speech. (Resp. at 11.) But the allegations in TST's Complaint already plainly establish that the invocations so qualify. For one, TST's Complaint makes clear that the City exercises exclusive control over which speakers may deliver invocations. The Complaint alleges that the City "has a longstanding practice of inviting clergy" to deliver invocations and that the City improperly wielded its discretion in inviting speakers by declining to schedule Vavrick. (Compl. ¶¶ 2, 26.) Moreover, the Complaint alleges that invocations are delivered at City Council's legislative sessions. (*Id*. at ¶ 2 (alleging that the City Council opens each meeting with an invocation).) Furthermore, although TST's Response contends that the City exercises no editorial control over invocations, its Complaint suggests otherwise. Indeed, the Complaint describes invocations before the City Council as quite uniform,

---

[2] For instance, the Supreme Court's rejection of a "far-fetched" argument that federal trademark registration — granted to "a vast array of commercial products and services" — constitutes government speech has no bearing on this dispute. *See Matal v. Tam*, 582 U.S. 218, 236 (2017). Unlike an invocation delivered in City Hall at the outset of a legislative proceeding, trademark registration does not closely associate a product with any government body. Likewise, decisions holding that custom license plates are government speech (*Walker v. Texas Div., Sons of Confederate Veterans, Inc.*, 576 U.S. 200 (2015)) or that a beef marketing campaign is government speech (*Johanns v. Livestock Marketing Assn.*, 544 U.S. 550 (2005)) do not compel the conclusion that legislative invocations are not government speech.

with a "typical invocation" involving a "brief, uplifting prayer in which [the invocator] asks for spiritual guidance for members of City Council as they undertake their challenging work of representing the diverse communities of the City of Chicago." (*Id*. at ¶ 16.)

In sum, the clear weight of authority and TST's own allegations establish that the City's choice of invocators constitutes government speech. Accordingly, for reasons stated in the City's Motion to Dismiss, the Court should reject TST's demands that the City allow it to "participate in providing an invocation" and that the City "establish a clear process for submission and consideration of requests to provide invocations before City Council." (Compl. at 9.)

## II. The City's Invocation Practices Do Not Violate The Establishment Clause.

TST asserts that the City's Motion to Dismiss "omits that government speech is limited by the Establishment Clause." (Resp. at 3.) To the contrary, the City explicitly acknowledged that the government speech at issue in legislative invocations can implicate the Establishment Clause. (*See* Motion to Dismiss at 6 (stating the Establishment Clause can be implicated by legislative prayer and citing *Gundy*, 50 F.4th at 70, for the proposition that it is "the proper constitutional vehicle to attack the government speech at issue").) The City's argument is simply that its invocation practices fall well within the range allowed by the Establishment Clause. TST does not genuinely dispute that the City's invocation practice comports with historical tradition, nor does it show that the practice has been exploited to proselytize or disparage certain beliefs. Because TST does not plausibly allege any violation of the Establishment Clause, its claim should be dismissed.

### A. The City Council's invocations are consistent with historical practices approved by the Supreme Court.

TST does not genuinely dispute that the City's legislative invocation practice "fits within the tradition long followed in Congress and the state legislatures." *Town of Greece*, 572 U.S. at

577. Instead, it argues that "'tradition' is not the sole metric for whether a practice is constitutional under the Establishment Clause." (Resp. at 14.) This is unavailing, because the City does not maintain that historical tradition is the "*sole* metric"; both here and in its Motion, the City has explained that its invocation practice survives an Establishment Clause challenge both because it comports with longstanding practice dating back to the First Congress *and* because TST alleges no facts suggesting it has been used to proselytize or disparage those of other beliefs. (Motion to Dismiss at 10–13; Section II. B., *infra*.).

The Supreme Court has made clear, however, that the historical approach used in *Marsh* and *Town of Greece* is of central importance, reaffirming recently in *Kennedy v. Bremerton School District* that the "Establishment Clause must be interpreted by 'reference to historical practices and understandings.'" 142 S. Ct. 2407, 2411 (2022) (quoting *Town of Greece*, 572 U.S. at 576). In Establishment Clause analyses, "[t]he line that courts . . . must draw between the permissible and the impermissible has to accor[d] with history," and an analysis focused on history "has long represented the rule." *Id.* at 2428 (internal quotation marks omitted). TST itself alleges that the City has a "longstanding tradition of welcoming the clergy of local congregations to open meetings with a brief prayer," which "typical[ly]" includes a request "for spiritual guidance for members of City Council as they undertake their challenging work." (Compl. ¶¶ 18, 16.) This describes a practice that comports with the tradition the Court recognized. *See Town of Greece*, 572 U.S. at 582–83. Because TST does not allege anything to suggest the City's practice is out of step with the lengthy tradition of legislative invocations, the Court should find in favor of the City on this prong of the analysis.

7

### B. TST does not allege that the City's invocation practice has favored or disparaged anyone's faith or beliefs.

TST's allegations also fail to plausibly suggest that the City's invocation practice has been exploited to either favor or disparage any religion. The analysis here "requires an inquiry into the prayer opportunity *as a whole*," to identify any "*pattern* of prayers that over time denigrate, proselytize, or betray an impermissible government purpose." *Town of Greece*, 57 U.S. at 583 (emphases added). The two invocations TST picked out from the large universe of publicly available invocations, however, do not plausibly establish a violation of this standard.

At the outset, *Marsh* instructs that it is not appropriate to "embark on a sensitive evaluation or to parse the content of a particular prayer" absent an "indication that the prayer opportunity has been exploited" to proselytize or disparage. 463 U.S. at 794–95. And even if that exercise were appropriate, TST's two examples can be easily dispatched. They make passing references to "unbiblical and ungodly ideologies" and "the only [God] with power and riches and wisdom and strength." (*See* Resp. at 19.) But these two examples do not suggest that the practice has "over time" "denigrate[d] nonbelievers or religious minorities, threaten[ed] damnation, or preach[ed] conversion." *Town of Greece*, 572 U.S. at 583. They do not go further than the legislative prayer practice the Court upheld in *Town of Greece*, where the prayers were "explicitly Christian — constantly and exclusively so," and sometimes invoked religious holidays, scripture or doctrine, *e.g.*: "It is in the solemn events of [Holy Week] that we find the very heart and center of our Christian faith. We acknowledge the saving sacrifice of Jesus Christ on the cross." *Id.* at 627–28 (Kagan, J., dissenting), 572. One of those invocations, moreover, "characterized objectors as a 'minority' who are 'ignorant of the history of our country,'" and another "lamented that other towns did not have 'God-fearing' leaders." *Id.* at 585. Even so, the Court found those prayers did "not despoil [the] practice." *Id.* at 585. Here, too, there is no

8

indication that the City's practices could create any pattern of disparagement or proselytization that would impugn the City's practice. Indeed, the City has selected invocators from a variety of faith communities, including Christian, Jewish, Muslim, and Buddhist congregations — a practice more inclusive than those the Supreme Court and circuit courts have specifically approved.[3]

As a last attempt to save its Establishment Claim from dismissal, TST argues, based on *Williamson v. Brevard Cty.*, 928 F.3d 1296 (11th Cir. 2019), that even if the City's invocation practice does not proselytize or denigrate any faith, its method for *selecting* clergy could still be held to violate the Establishment Clause. (Resp. at 21.) *Williamson* does not bind this Court, and the Eleventh Circuit employed a three-factor test that has never been endorsed by the Supreme Court or the Seventh Circuit. *See Williamson*, 928 F.3d at 1298–99 ("In this Circuit, we . . . apply[] a three-factor test that considers the *identity* of the invocation speakers, the *process* by which they are selected, and the *nature* of the prayers they deliver."). The test the Eleventh Circuit used in *Williamson* cannot be squared with Supreme Court precedent; taken it to its logical conclusion, it would effectively abrogate the Court's history-based upholding of legislative prayer practices like that in *Marsh*, where a single clergyman of one denomination had been selected for 16 years.[4]

---

[3] The invocation given by Rev. Patti Sakai of the Buddhist Temple of Chicago at the May 31, 2023 City Council Meeting is publicly available at https://vimeo.com/showcase/6277394/video/831664375 (22:10–26:35) ("[T]his is my Buddhist invocation today that as you fulfill your responsibilities . . . know that each of you can be the manifestation of Guan Yin, hearing the voices of the people and responding to them in wise and compassionate ways."). (*Cf.* Opp. at 13 n.7.)

[4] *Town of Greece* also cautions that a "quest to promote a diversity of religious views would require . . . wholly inappropriate judgments about the number of religions [a city] should sponsor and the relative frequency with which it should sponsor each, a form of government entanglement with religion that is far more troublesome than the current approach." 572 U.S. at 586 (cleaned up).

9

And *Williamson* is readily distinguishable regardless. The commission at issue in *Williamson* passed a resolution noting its "recognition of the traditional positive role [of] *faith-based monotheistic* religions," and "facially discriminat[ing] between religions" by barring invocations "from any organization whose precepts, tenets or principles espouse or promote not just 'reason' and 'science' but also 'environmental factors, nature' and even 'ethics.'" *Id.* at 1299 (emphasis added), 1311–12. On those facts, the *Williamson* court went "no further" than to hold that "[c]ommissioners may not categorically exclude from consideration speakers from a religion simply because they do not like the nature of its beliefs." *Id.* at 1299.

Nothing in the Complaint suggests that the City has similarly categorically excluded any invocators based on the nature of their beliefs. To the contrary, it has invited diverse invocators from a range of City institutions. TST makes a feeble effort to suggest the City's practices are discriminatory. Although not alleged in or appended to its Complaint, TST's Response cites an email from Alderman Daniel LaSpata that allegedly indicates Vavrick was excluded from the opportunity to give an invocation "based on City Council members' disapproval of [his] beliefs." (Resp. at 15.) But the email is not indicative of the City's views toward TST because, unlike in *Williamson*, where the members of the commission themselves had "plenary authority, on a rotating basis, to invite whomever they want," *Williamson*, 928 F.3d at 1299, Alderman LaSpata does not speak for the City, nor does he have the authority to select invocators. Alderman LaSpata's views simply cannot be attributed to the City. *See Civil Liberties for Urb. Believers v. City of Chicago*, 342 F.3d 752, 764 (7th Cir. 2003) (explaining that "Chicago cannot be held liable for" a single alderman's actions and motives). Even more, the email does not suggest that the Alderman himself disapproved of TST's religious beliefs. The email, dated April 3, 2022, was sent more than two years after Vavrick first requested to provide an invocation, and only

after Vavrick attempted to involve Alderman LaSpata in his efforts. (Compl. ¶ 19; ECF 7 (Motion for Preliminary Injunction), at 6–7.) The Alderman merely clarified that, "*[if] the clerk's office or IGA should decide to act on [Vavrick's] request*," they should not interpret the fact that Vavrick copied LaSpata on his emails to the City Clerk's office as an endorsement from the Alderman. (ECF 7-3, April 3, 2022 email) (emphasis added).) And while the email stated that the Alderman could not personally support Vavrick's intention "to end his convocation with 'Hail Satan,'" TST itself does "not worship Satan or believe in the existence of a literal Satan" (ECF 7, at 4); rather, it employs Satan as a "symbol" and "metaphor." (*Id.*) LaSpata's views on what TST itself considers a mere symbol suggest no disapproval of any of TST's actual beliefs. (*See* ECF 7 at 4 n.2 (listing TST's "Seven Tenets").)

At bottom, TST's Establishment Clause claim rests solely on the fact that Vavrick was not invited to deliver an invocation. (Compl. ¶ 31 ("By excluding Plaintiffs . . . while opening this forum to clergy from other faiths, Defendant violates the First Amendment's establishment clause.").) For the reasons set out above and in the City's Motion, that is not enough to allege an Establishment Clause claim. (*See* Motion to Dismiss at 11.) TST's allegations do not plausibly suggest that the City's invocation process departs from historical practices or that it has been exploited for proselytization or to disparage any faith. TST's claim should be dismissed accordingly.

11

**CONCLUSION**

WHEREFORE, for the reasons explained above and in the City's Motion, the City respectfully requests that the Court dismiss TST's claims with prejudice pursuant to Federal Rule of Civil Procedure 12(b)(6) and grant the City such other relief as it deems just and proper.

Date:  August 4, 2023                                                   Respectfully submitted,

BRADLEY G. WILSON                                              MARY B. RICHARDSON-LOWRY,
bradley.wilson@cityofchicago.org                             Corporation Counsel for
DAVID BRANDON SMITH                                          the City of Chicago
david.smith4@cityofchicago.org
KATHERINE ROSE LAMB                                        By:     */s/ Katherine Rose Lamb*
katherine.lamb@cityofchicago.org                                     Katherine Rose Lamb
City of Chicago, Department of Law                                Assistant Corporation Counsel
Constitutional and Commercial
 Litigation Division
2 North Lasalle Street, Suite 520
Chicago, Illinois 60602
(312) 744-7686 / 4-7220 / 2-0797

*Attorneys for the City*