**IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

THE SATANIC TEMPLE, INC., and     )
ADAM VAVRICK,     )
    )
    Plaintiffs,     )
    )  Case No. 23 C 2780
    v.     )
    )  Judge Joan H. Lefkow
THE CITY OF CHICAGO,     )
    )
    Defendant.     )

## OPINION AND ORDER

In this lawsuit, The Satanic Temple, Inc. and its Minister of Satan, Adam Vavrick, allege that the City of Chicago violates the First Amendment by refusing to allow Vavrick to deliver an invocation on behalf of The Satanic Temple at a Chicago City Council meeting. They seek compensatory, declaratory and injunctive relief. Before the court are plaintiffs' motion for preliminary injunction and the City's motion to dismiss for failure to state a claim. (Dkts. 7, 11.) For the reasons explained below, the motion to dismiss is granted in part and denied in part, and the motion for preliminary injunction is denied.

## BACKGROUND

### I.   Allegations in the Complaint

As alleged in the complaint, the Satanic Temple (TST) is a "non-theistic religion" with the mission to "encourage benevolence and empathy among all people, reject tyrannical authority, advocate for common sense and justice, and be directed by the human conscience to undertake noble pursuits." (Dkt. 1 ¶ 11.) TST further "encourages its members to engage in civic advocacy, confront hateful, repressive and exclusionary ideologies, and promote the common

1

good in accordance" with a set of core beliefs it refers to as "the Seven Tenets." (*Id.*) TST is "federally recognized as a church and a religious public charity" and "has more than half a million members located in every state (including Illinois) and internationally." (*Id.*)

TST's Illinois Congregation (TST-IL) was founded in 2016 and seeks "to promote Satanic education within the Congregation, to be a force for positive change within Illinois, [and] to provide a safe and welcoming community for marginalized members of society." (*Id.* ¶ 12.) "TST-IL has been recognized as a bona fide religious congregation by the State of Illinois via its annual holiday display in the Illinois State Capitol Rotunda in Springfield and by Cook County in its acceptance of marriage licenses solemnized by TST-IL clergy." (*Id.*) Vavrick serves as TST-IL's "Co-Congregation Head" and is "an ordained Minister of Satan." (*Id.* ¶ 13.) Vavrick has been involved with TST since 2014 and in leadership roles with TST-IL since 2020. (*Id.*) In this capacity, Vavrick "regularly ministers to TST-IL congregants at monthly services, officiates weddings for couples in Illinois and elsewhere, and actively engages with the interfaith community throughout Illinois." (*Id.* ¶ 14.) Vavrick's "role as a bona fide religious leader has been recognized by the State of Illinois in connection with TST-IL's annual holiday display in the state capitol; by the Cook County Bureau of Vital Records, which accepts marriage licenses solemnized by [Vavrick]; and by the Chicago Police Department, which has invited his participation in its 'Faith & Blue' initiative." (*Id.* ¶ 15.)

This case focuses on Vavrick's efforts to give the invocation at a Chicago City Council meeting. The City Council typically begins its meetings by reciting the Pledge of Allegiance and hearing an invocation delivered by a local clergy member. (*Id.* ¶ 16.) For example, clergymen from St. Luke Church of God in Christ, Park Community Church, and Mount Carmel Bible Church gave the invocations for the December 2022, January 2023, and February 2023 City

Council meetings. (*Id.* ¶ 17.) "In the typical invocation, a member of the clergy offers a brief, uplifting prayer in which he or she asks for spiritual guidance for members of City Council as they undertake their challenging work of representing the diverse communities of the City of Chicago." (*Id.* ¶ 16.) Consistent with this tradition, Vavrick "wishes to offer an uplifting message which draws on his deeply held beliefs and calls upon lawmakers to be guided by empathy, compassion and rationalism in their difficult jobs." (*Id.* ¶ 18.)

Vavrick's efforts to deliver an invocation began in January 2020 when he spoke with Chauncy Rice, who at that time served as chief of public engagement for the Office of the City Clerk. (*Id.* ¶ 19.) Rice informed Vavrick "that he would be happy to schedule [Vavrick] to provide an invocation after 'standard vetting procedures.'" (*Id.*) Vavrick then "followed up the conversation with an email in which he provided Mr. Rice with additional information about TST and the local congregation." (*Id.* ¶ 20.) Although Rice "acknowledged receipt of the information and stated that he would get back in touch with [Vavrick] in the near future," he never did. (*Id.*) Vavrick sent emails monthly for several months to follow-up, but these went unanswered. (*Id.*)

In August 2021, Vavrick exchanged emails with Ariana Garcia, Rice's replacement as chief of public engagement in the Office of the City Clerk. (*Id.* ¶ 21.) Garcia "acknowledged receipt of [Vavrick's] request and was initially receptive to scheduling him to provide an invocation, but [Vavrick's] follow-up messages went unanswered." (*Id.*) Garcia then told Vavrick in October 2021 that she would follow up with him after the budget cycle. (*Id.* ¶ 22.) After Vavrick still received no follow-up, he emailed Garcia again in March 2022 and copied Board of Ethics Director Steve Berlin. (*Id.* ¶¶ 22–23.) In this email, Vavrick "describe[d] the history of his efforts to provide an invocation and ask[ed] for guidance about the process for

scheduling." (*Id.* ¶ 23.) Garcia responded that she was "working on this request" but did not

provide any additional information "regarding the timeline or process," and did not reply to

follow-up emails Vavrick sent in May 2022. (*Id.*) Vavrick then escalated his efforts by

"submitting a FOIA request to determine what had become of his many requests to provide an

invocation" and sending an email in July 2022 to "the various attorneys and individuals in the

mayor's office to whom his previous requests had been forwarded." (*Id.* ¶ 24.) Vavrick received

no response to this email. (*Id.*)

Vavrick then retained counsel and spoke with City attorneys. (*Id.* ¶ 25.) "During calls on

March 16, 2023 and March 30, 2023, counsel for the City was unable to articulate the process for

seeking to provide an invocation and could not say whether the City would permit [Vavrick] to

deliver an invocation." (*Id.*) Over the course of these three years of communication, the City has

"never formally rejected [Vavrick's] request to provide an invocation" but has instead "simply

resisted scheduling him … without providing a definitive answer about whether he will ever be

permitted to provide an invocation." (*Id.* ¶ 26.)

## II.     Preliminary Injunction Record

Plaintiffs present essentially the same factual record in support of their motion for

preliminary injunction as alleged in the complaint, with Vavrick providing an affidavit as

evidence in support of his description of the interactions he had with various City officials while

seeking approval of his request. (*See* dkt. 7 at 2–8; dkt. 7-2.) Plaintiffs also submit a list of all the

clergy members and their respective churches who gave invocations before City Council

meetings from January 2020 to April 2023. (Dkt. 7-1.) Finally, plaintiffs produce an April 3,

2022 email from Alderman Daniel La Spata to Garcia in which La Spata writes, in full:

Hey Ariana,

I see that I'm still copied on Adam's emails. If the clerk's office or IGA should decide to act on his request, please know that it is not at my behest. Once I learned that he wanted to end his convocation with "Hail Satan" it ceased being something I could support. For all of my desire to be inclusive, that would be a betrayal of my personal faith.

Kind regards,

Daniel

(Dkt. 7-3.)[1]

## **LEGAL STANDARDS**

A motion under Federal Rule of Civil Procedure 12(b)(6) challenges the sufficiency of the complaint to state a claim upon which relief may be granted. The Federal Rules of Civil Procedure require that a claim for relief contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). To comply with this Rule, the complaint "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft* v. *Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp.* v. *Twombly*, 550 U.S. 544, 570 (2007)). These allegations "must be enough to raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555. "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678. Additionally, this standard requires "more than a sheer possibility that a defendant has acted unlawfully. … Where a complaint pleads facts that are 'merely consistent with' a defendant's liability, it 'stops short of

---

[1] Because this email and its content are neither mentioned in nor attached to plaintiffs' complaint, the court does not consider La Spata's statements in its analysis of whether the complaint sufficiently states a claim for relief.

the line between possibility and plausibility of entitlement to relief.'" *Id.* (quoting *Twombly*, 550 U.S. at 557) (cleaned up).

In ruling on 12(b)(6) motions, the court accepts as true all well-pleaded facts in the complaint and draws all reasonable inferences in the plaintiff's favor. *See Taha* v. *Int'l Bhd. of Teamsters, Local 781*, 947 F.3d 464, 469 (7th Cir. 2020). There is no requirement that the complaint plead legal theories. *See Alioto* v. *Town of Lisbon*, 651 F.3d 715, 721 (7th Cir. 2011) (collecting cases). Thus, the "complaint survives if the facts alleged plausibly entitle [the plaintiff] to legal relief under some theory, even if not one expressly identified in the complaint." *Liston* v. *King.com, Ltd.*, 254 F. Supp. 3d 989, 1002 (N.D. Ill. 2017).

Succeeding on a motion for preliminary injunction requires a plaintiff to show that "(1) he is likely to succeed on the merits of his claim; (2) he will suffer irreparable harm without an injunction; (3) the balance of equities weighs in his favor; and (4) an injunction furthers the public interest." *Braam* v. *Carr*, 37 F.4th 1269, 1272 (7th Cir. 2022) (citing *Winter* v. *Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008)). The first step of this analysis "is often decisive," *id.*, because the court may issue a preliminary injunction only if the plaintiff demonstrates "that its claim has some likelihood of success on the merits, … not merely a 'better than negligible' chance." *Mays* v. *Dart*, 974 F.3d 810, 822 (7th Cir. 2020) (cleaned up). Furthermore, the court must "approach the record from a neutral and objective viewpoint, assessing the merits as … they are likely to be decided after more complete discovery and litigation." *Doe* v. *Univ. of S. Ind.*, 43 F.4th 784, 792 (7th Cir. 2022). Thus, the court "do[es] not accept [the plaintiff's] allegations as true" or give "the benefit of all reasonable inferences in his favor," as it would when considering a motion to dismiss. *Id.* at 791. Similarly, the court does not give the plaintiff

"the benefit of conflicting evidence" as it would when considering a motion for summary judgment. *Id.*

## ANALYSIS

### I.     Motion to Dismiss

Plaintiffs contend that the City's conduct violates the First Amendment in two ways: "(1) the City violates the establishment clause by excluding disfavored minority faiths from the opportunity to provide an invocation; and (2) the City grants the City Clerk unconstrained discretion to decide who can and cannot deliver an invocation." (Dkt. 1 ¶ 28.) The City argues that neither of these theories plausibly states a valid claim for relief, insisting that the government speech doctrine gives the City full discretion over whom it invites to give invocations and that the City's invocation practices are consistent with those upheld by the Supreme Court. (*See* dkt. 11.) The court agrees that plaintiffs fail to state a claim under the Free Speech Clause but concludes that plaintiffs have pleaded sufficient facts to plausibly allege that the City violated the Establishment Clause.

### A.     Claims at Issue

Before the court can examine the merits, however, it first must clarify the claims at issue. The complaint consists of a single count based on the First Amendment. Strictly speaking, the First Amendment applies only to the federal government and therefore provides no direct legal basis for plaintiffs' lawsuit against the City of Chicago. *See* U.S. Const. amend. I (limiting federal government's power to make regulations "respecting an establishment of religion, or prohibiting the free exercise thereof; or abridging the freedom of speech, or of the press"). Instead, the protections of the First Amendment apply to states and municipalities by virtue of the due process clause of the Fourteenth Amendment. *See Gitlow* v. *New York*, 268 U.S. 652,

666 (1925) ("freedom of speech and of the press—which are protected by the First Amendment

from abridgment by Congress—are among the fundamental personal rights and 'liberties'

protected by the due process clause of the Fourteenth Amendment from impairment by the

States."); *Cantwell* v. *Connecticut*, 310 U.S. 296, 303 (1940) (incorporating Free Exercise and

Establishment Clauses); *Everson* v. *Bd. of Educ. of Ewing Tp.*, 330 U.S. 1, 15–16 (1947)

(incorporating Establishment Clause). The court therefore construes the complaint as seeking

relief for violations of the First Amendment as applied to the states by the Fourteenth

Amendment.

Additionally, although the complaint indicates that plaintiffs seek declaratory relief, an

injunction, and damages, it does not identify the legal vehicle by which plaintiffs seek such

remedies. (*See* dkt. 1 at 9.) The complaint need not identify legal theories, but the facts pleaded

must suffice under some legal theory for the complaint to survive. *See Alioto*, 651 F.3d at 721;

*Liston*, 254 F. Supp. 3d at 1002. Federal law provides two paths to obtain redress for the

unconstitutional acts of state officials and local governments. First, 42 U.S.C. § 1983 allows

courts to award damages or provide equitable relief when a "person" acting "under color of"

state law causes "the deprivation of any rights, privileges, or immunities secured by the

Constitution and laws" of the United States. *Id.* Second, the Supreme Court has recognized the

"judge-made" equitable doctrine that "federal courts may in some circumstances grant injunctive

relief against state officers who are violating, or planning to violate, federal law." *Armstrong* v.

*Exceptional Child Ctr., Inc.*, 575 U.S. 320, 326–27 (2015) (citing *Osborn* v. *Bank of United

States*, 9 Wheat. 738, 838–39, 844 (1842); *Ex parte Young*, 209 U.S. 123, 150–51 (1908)). Under

this equitable doctrine, a plaintiff may file suit in federal court seeking "prospective relief against

an ongoing violation of federal law" by state officials. *Driftless Area Land Conservancy* v.

*Valcq*, 16 F.4th 508, 521 (7th Cir. 2021) (citing *Idaho* v. *Coeur d'Alene Tribe of Idaho*, 521 U.S. 261, 281 (1997)).

Because only Section 1983 provides a vehicle for a plaintiff to seek a damages remedy for a constitutional violation by a municipality, the court construes the damages aspect of the complaint as articulating a Section 1983 claim. *See Monell* v. *Dep't of Soc. Servs.*, 436 U.S. 658, 690–91 (1978). The aspects of the complaint seeking prospective declaratory and injunctive relief could proceed under Section 1983 or, in theory, the court's equitable authority to enjoin ongoing federal rights violations.[2] Under Section 1983, a plaintiff may sue a municipal entity for violations of constitutional rights caused by its policies or customs, but not "for an injury inflicted solely by its employees or agents." *Id.* To avoid interpreting a judge-made doctrine to have greater reach than a statutory remedy crafted by Congress—and absent any argument from the parties—the court assumes that its equitable authority extends no further than municipal liability under Section 1983. As such, the court treats the complaint as one stating a claim for municipal liability under Section 1983 and *Monell*.[3]

## B.     Municipal Liability

"For a *Monell* claim to survive a motion to dismiss, a plaintiff must plead facts that plausibly suggest that: (1) she was deprived of a constitutional right; (2) the deprivation can be

---

[2] This equitable authority developed to allow federal courts to enjoin rights violations by state officials in their official capacities while also respecting the Eleventh Amendment's provision of state immunity. *See generally Ex parte Young*, 209 U.S. 123. Because municipalities are not organs of state government, *see Monell*, 436 U.S. at 690 n.54, the *Ex parte Young* doctrine technically does not apply. But the Supreme Court has recognized that the equitable power exercised in *Ex parte Young* and its progeny involves "[t]he ability to sue to enjoin unconstitutional actions by state and federal officers" and "reflects a long history of judicial review of illegal executive action[.]" *Armstrong*, 575 U.S. at 327. Because municipalities are "persons" for the purposes of Section 1983, *see Monell*, 436 U.S. at 690, the court assumes they are also suable "persons" when calling on its equitable authority.

[3] The court therefore has federal question jurisdiction over this matter. *See* 28 U.S.C. §§ 1331, 1343(a). Venue is proper under 28 U.S.C. § 1391(b).

traced 'to some municipal action (i.e., 'a policy or custom'), such that the challenged conduct is properly attributable to the municipality itself'; (3) 'the policy or custom demonstrates municipal fault, i.e., deliberate indifference'; and (4) 'the municipal action was the moving force behind the federal-rights violation.'" *Thomas* v. *Neenah Joint Sch. Dist.*, 74 F.4th 521, 524 (7th Cir. 2023) (quoting *Dean* v. *Wexford Health Sources, Inc.*, 18 F.4th 214, 235 (7th Cir. 2021)). Here, the City's arguments on the motion to dismiss focus on the first element and raise no challenge to the other elements needed to sustain a *Monell* claim. Accordingly, the court assumes for the purpose of the motion to dismiss that the complaint adequately alleges facts establishing the municipal action, municipal fault, and moving force elements of plaintiffs' *Monell* claim. Thus, this opinion focuses on whether plaintiffs have pleaded sufficient facts to plausibly allege that they suffered a constitutional deprivation.

## C.     Constitutional Deprivation

Plaintiffs contend that the City's invocation practices violate the First Amendment in two ways. First, "by excluding … Vavrick and The Satanic Temple from providing an invocation before the City Council, while opening this forum to clergy from other faiths, [the City] violates the First Amendment's establishment clause." (Dkt. 1 ¶ 31.) Second, the "unbridled discretion" given the City Clerk to pick speakers to give invocations violates the First Amendment by "creating an unreasonable risk of arbitrary and discriminatory decision-making." (*Id.* ¶ 34.) The First Amendment provides, as pertinent here, that "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof; or abridging the freedom of speech[.]" U.S. Const. amend. I. The complaint explicitly invokes the Establishment Clause, so the court analyzes the complaint under that provision. But plaintiffs' use of the "forum" and "opening a forum" language also employs terms of art under the Free Speech Clause. *See United*

States v. *Krahenbuhl*, 88 F.4th 678, 682 (7th Cir. 2023) ("The constitutionality of the [speech] regulation depends on where the expression occurred, that is, the forum."). Because the nature of the Free Speech Clause claim is not clear from the face of the complaint, the court begins its analysis there before turning to the Establishment Clause dispute.[4]

  *1. Free Speech Clause*

  The City argues that invocations given before City Council meetings constitute government speech and therefore are not governed by the Free Speech Clause. (Dkt. 11 at 4–6.) The City is correct that the First Amendment generally does not regulate what the government itself chooses to say. "'The Free Speech Clause restricts government regulation of private speech; it does not regulate government speech.' … Governments may speak for themselves and are not required simultaneously to express an opposing viewpoint." *Higher Soc'y of Ind.* v. *Tippecanoe Cnty.*, 858 F.3d 1113, 1117 (7th Cir. 2017) (quoting *Pleasant Grove City* v. *Summum*, 555 U.S. 460, 467 (2009)).

  When "a government invites the people to participate in a program[,]" however, "[t]he boundary between government speech and private expression can blur." *Shurtleff* v. *City of Bos.*, 596 U.S. 243, 252 (2022). To tease out this distinction, the Supreme Court directs courts to "conduct a holistic inquiry … driven by a case's context rather than the rote application of rigid factors." *Id.* Evidence relevant to guide the inquiry can include "the history of the expression at issue; the public's likely perception as to who[m] (the government or a private person) is

---

[4] By alleging that the City excluded Vavrick from giving religious speech in a "forum" while permitting clergy from other faiths to do so, the complaint also implicates the Free Exercise Clause. *See Kennedy* v. *Bremerton Sch. Dist.*, 597 U.S. 507, 525 (2022) (free exercise violation occurs when "a government entity has burdened … sincere religious practice pursuant to a policy that is not 'neutral' or 'generally applicable.'"). Since the parties only make arguments relating to the Free Speech and Establishment Clauses, however, the court disregards plaintiffs' passing mention of their "Free Exercise claim." (*See* dkt. 20 at 2.)

speaking; and the extent to which the government has actively shaped or controlled the expression." *Id.* (citing *Walker* v. *Tex. Div., Sons of Confederate Veterans, Inc.*, 576 U.S. 200, 209–14 (2015)). If the government does not speak for itself but rather regulates private speech, then "the First Amendment prevents [the government] from discriminating against speakers based on their viewpoint." *Id.* at 247; *see also Krahenbuhl*, 88 F.4th at 682–83 (describing constitutional protections applying to different categories of public and nonpublic fora). Additionally, government speech is still subject to the Establishment Clause (so that analysis must proceed regardless of whether the court dismisses plaintiffs' Free Speech claim). *See Summum*, 555 U.S. at 468.

The City's motion to dismiss relies on cases in which other courts have found similar legislative prayer practices to be government speech. (Dkt. 11 at 4 (citing *Ctr. for Inquiry, Inc.* v. *Marion Cir. Ct. Clerk*, 758 F.3d 869, 874 (7th Cir. 2014); *Gundy* v. *City of Jacksonville*, 50 F.4th 60, 72 (11th Cir. 2022); *Fields* v. *Speaker of Pa. House of Representatives*, 936 F.3d 142, 160 (3d Cir. 2019)); dkt. 23 at 2–3, 3 n.1 (citing *Gundy*, 50 F.4th at 80; *Fields*, 936 F.3d at 158–59; *Simpson* v. *Chesterfield Cnty. Bd. of Sup'rs*, 404 F.3d 276, 280 (4th Cir. 2005); *Bormuth* v. *Cnty. of Jackson*, 116 F. Supp. 3d 850, 852 (E.D. Mich. 2015) *aff'd* 870 F.3d 494 (6th Cir. 2017); *Coleman* v. *Hamilton Cnty.*, 104 F. Supp. 3d 877, 883 (E.D. Tenn. 2015)).) But although "the long-established practice of opening legislative meetings with prayer" generally concerns "what a chosen agent of the government says as part of the government's own operations" rather than "how a state regulates private conduct[,]" *Ctr. for Inquiry*, 758 F.3d at 874, drawing conclusions about whether a particular practice constitutes government speech depends on the factual record. *See Shurtleff*, 596 U.S. at 252; *Gundy*, 50 F.4th at 77–80 (looking to record on summary judgment to determine whether invocation constitutes government speech); *Turner* v. *City*

12

*Council of City of Fredericksburg*, 534 F.3d 352, 354–55 (4th Cir. 2008) (same); *but see Fields*, 936 F.3d at 158–59 (holding that legislative prayer is government speech as a matter of law without reference to specific facts of case). Conducting a factual analysis is important because the government could, for example, adopt a more open legislative prayer process that turns invocations into something more akin to a nonpublic forum. *See Milestone* v. *City of Monroe*, 665 F.3d 774, 783 n.3 (7th Cir. 2011) (defining "limited" or "nonpublic" forum as "a place the government has opened only for specific purposes or subjects").

Plaintiffs, however, allege little relevant to the factors identified in *Shurtleff* v. *City of Boston* for identifying government speech. First, regarding "the history of the expression at issue," the complaint includes general allegations that the City has a "longstanding practice" and "longstanding tradition" of "regularly" opening City Council meetings with "an invocation delivered by a local clergy member." (Dkt. 1 ¶¶ 2, 16, 18.) Next, the complaint is essentially silent about "the public's likely perception as to who[m] (the government or a private person) is speaking," *Shurtleff*, 596 U.S. at 252, other than noting that the "typical invocation" involves "a brief, uplifting prayer in which [the clergy member] asks for spiritual guidance for members of City Council as they undertake their challenging work of representing the diverse communities of the City of Chicago." (Dkt. 1 ¶ 16.) Finally, regarding "the extent to which the government has actively shaped or controlled the expression," *Shurtleff*, 596 U.S. at 252, plaintiffs allege that the City has no criteria or process for selecting clergy to give an invocation. (Dkt. 1 ¶¶ 25, 32–33.) The complaint further includes several allegations suggesting that the City permits members of the public to request to give invocations:

- In January 2020, Chauncy Rice, chief of public engagement for the Office of the City Clerk, told Vavrick that "he would be happy to schedule [Vavrick] to provide an invocation after 'standard vetting procedures.'" (*Id.* ¶ 19.)

- Rice then accepted information about TST and promised to "get back in touch with [Vavrick] in the near future." (*Id.* ¶ 20.)

- In August 2021, Vavrick renewed his request with Rice's replacement, Ariana Garcia, who "acknowledged receipt of his request and was initially receptive to scheduling [Vavrick] to provide an invocation." (*Id.* ¶ 21.)

- In October 2021, Garcia promised to "follow up with [Vavrick] after the budget cycle." (*Id.* ¶ 22.)

- In March 2022, Garcia again indicated to Vavrick that she was "working on his request." (*Id.* ¶ 23.)

Drawing all reasonable inferences in plaintiffs' favor, the court must infer from these allegations that the City grants requests after applying "standard vetting procedures" from the public to give invocations but specifically did not act on Vavrick's request.

This bare set of facts makes it difficult for the court to draw any conclusions about whether invocation policies regulate private speech. As to the first two factors, the complaint lacks the context necessary for the court to assess the history and public perceptions of the City's legislative invocation practices. That such practices are longstanding and usually involve prayers seeking guidance for the City Council tells the court nothing about the manner in which the City has historically selected clergy to give invocations, how public-facing the prayers are, or whether the City views the invocation as for the benefit of the members of the City Council or an opportunity for the City to recognize and give a platform to local faith and community leaders.

14

That leaves the government-control factor. The complaint provides slightly more detail on this point, indicating that the City lacks a policy for selecting clergy to give the invocation but generally accepts requests from those who wish to do so, subject to "standard vetting procedures." (Dkt. 1 ¶ 19.) In other words, the City chooses to relinquish at least some control over selecting invocation speakers and open that process to public request. This implied relinquishment of control and openness to public participation might lean in favor of finding that the City's legislative prayer practices constitute regulation of private, rather than government, speech. *See Shurtleff*, 596 U.S. at 253–58 (concluding that flags flown on city property in front of Boston's City Hall constituted private speech where government took "come-one-come-all attitude" to allowing members of public to fly flags on those flagpoles). But without allegations regarding who ultimately makes selection decisions[5] or what the "standard vetting procedures" consist of, it is impossible to infer the extent of the control surrendered by the City.

In light of the clear weight of precedent holding that legislative prayer practices constitute government speech, this bare set of facts is not enough to plausibly allege that invocations are not the government's own speech. To be sure, the openness to public request alleged by plaintiffs is consistent with a decision by the City to open up the process and create something resembling a nonpublic forum for invocations. But mere consistency is not enough. *See Iqbal*, 556 U.S. at 678 (plausibility pleading standard "asks for more than a sheer possibility that a defendant has acted unlawfully"). And with essentially no context, the court has no way to

---

[5] The complaint contains the conclusory assertion that "the City grants the City Clerk unconstrained discretion to decide who can and cannot deliver an invocation." (Dkt. 1 ¶¶ 4, 31.) But the factual allegations in the complaint only show that Vavrick communicated with staff in the Office of the City Clerk who indicated that they could be helpful in scheduling him to give an invocation. (*Id.* ¶¶ 19–25.) Such allegations provide no information regarding who actually has final decision-making authority—whether that be the City Clerk, someone on the City Clerk's staff, the City Council, a City Council committee, or some collaboration of people with various positions with the City.

assess whether the allegations in the complaint even amount to a meaningful relinquishment of control. In short, plaintiffs pull together a handful of ambiguous facts about Vavrick's experience requesting to give an invocation, then try to extrapolate from that foundation. The result is little more than speculation and is insufficient to plausibly allege a Free Speech Clause violation. The City's motion to dismiss is therefore granted with respect to plaintiffs' Free Speech claim.

      2.     *Establishment Clause*

The City argues that the invocation practices alleged in the complaint do not violate the Establishment Clause because they "are consistent with historical practices approved by the Supreme Court" and have not "favored or disparaged anyone's faith or beliefs." (Dkt. 11 at 6, 10.) In making these arguments, the City relies heavily on the two Supreme Court decisions directly addressing legislative prayer: *Marsh* v. *Chambers*, 463 U.S. 783 (1983), and *Town of Greece* v. *Galloway*, 572 U.S. 565 (2014). In so doing, however, the City treats this case as presenting a similar challenge to the constitutional permissibility of legislative prayer as resolved by the Supreme Court in those cases. But this case is different in kind from *Marsh* and *Town of Greece*. Plaintiffs here agree that legislative prayer is constitutional. Instead of seeking to end the practice of holding an invocation at the start of City Council meetings, plaintiffs want an opportunity to be included in that practice. The Establishment Clause, they contend, does not allow the City to exclude Vavrick from giving an invocation on behalf of TST because of his beliefs. The court agrees with plaintiffs that the complaint plausibly alleges a violation of the Establishment Clause on this basis.

The Establishment Clause provides that "Congress shall make no law respecting an establishment of religion." U.S. Const. amend. I. In recent years, the Supreme Court has drastically revised judicial understandings of this provision. Rejecting the "purpose" and

16

"endorsement" tests developed from *Lemon* v. *Kurtzman*, 403 U.S. 602 (1971) and its progeny, the Supreme Court now directs that the Establishment Clause "must be interpreted by 'reference to historical practices and understandings.'" *Kennedy* v. *Bremerton Sch. Dist.*, 597 U.S. 507, 535 (2022) (quoting *Town of Greece*, 572 U.S. at 576); *see also Woodring* v. *Jackson Cnty.*, 986 F.3d 979, 987–88 (7th Cir. 2021) (summarizing various Establishment Clause tests used while *Lemon* remained good law). Despite this instruction, however, the historical method envisioned and practiced by the Supreme Court largely seems to proceed on an *ad hoc* basis. In *Town of Greece*, the Court explained that "it is not necessary to define the precise boundary of the Establishment Clause where history shows that the specific practice is permitted." 572 U.S. at 577. And in *Kennedy* v. *Bremerton School District*, the court rejected the idea that it was even possible to attempt a "'grand unified theory' for assessing Establishment Clause claims." 597 U.S. at 534–36 (quoting *Am. Legion* v. *Am. Humanist Ass'n*, 588 U.S. 29, 60 (2019) (plurality opinion) and overruling *Lemon*). Instead, the Court uses "a more modest approach that focuses on the particular issue at hand and looks to history for guidance." *Am. Legion*, 588 U.S. at 60.

In focusing narrowly on the historical provenance of the issues before it while also rejecting past precedent, however, the Supreme Court has not given courts a clear explanation of how it currently interprets the actual text of the Establishment Clause. Indeed, a textual analysis has been conspicuously absent in many recent Establishment Clause opinions. *See Kennedy*, 597 U.S. at 532–43; *Carson* v. *Makin*, 596 U.S. 767, 781 (2022); *Espinoza* v. *Mont. Dep't of Rev.*, 591 U.S. ----, 140 S. Ct. 2246, 2254 (2020); *Town of Greece*, 572 U.S. at 575–78. At the same time, the Court has given clues that a textual analysis lingers in the background of its decisions. In *Town of Greece*, the Court recognized that although "the Establishment Clause must be interpreted by reference to historical practices and understandings[,]" the Constitution

17

nevertheless "must not be understood as permitting a practice that would amount to a constitutional violation if not for its historical foundation." 572 U.S. at 576 (citations and quotation marks omitted). More recently, the plurality in *American Legion* v. *American Humanist Association* recognized that, "[w]hile the concept of a formally established church is straightforward, pinning down the meaning of a 'law respecting an establishment of religion' has proved to be a vexing problem." 588 U.S. at 48. These cases suggest that the Establishment Clause's text has some core, unambiguous meaning—the prohibition against a formally established religion or church—that even a longstanding historical practice to the contrary cannot alter, and that the Court's jurisprudence has not explored this core meaning because its work has focused almost entirely on edge cases. *See id.* at 48–50; *cf.* H.L.A. Hart, *Positivism and the Separation of Law and Morals*, 71 HARV. L. REV. 593, 607 (1957) (recognizing that legal language must contain "a core of settled meaning" as well as "a penumbra of debatable cases in which words are neither obviously applicable nor obviously ruled out").

This court, therefore, understands the Supreme Court to require consideration of both the text of the First Amendment and the relevant history and tradition of the challenged government practice when considering Establishment Clause challenges. *See, e.g.*, *N.Y. State Rifle & Pistol Ass'n, Inc.* v. *Bruen*, 597 U.S. 1, 17 (2022) (adopting analogous history-and-tradition test in Second Amendment context that directs courts to first consider the Amendment's "plain text" before turning to "historical tradition" evidence.) If the core meaning of the Establishment Clause prohibits a "formally established church," *Am. Legion*, 588 U.S. at 48, and this core meaning must be understood based on "reference to historical practices and understandings[,]" *Kennedy*, 597 U.S. at 535, then it follows that the Establishment Clause at its core prohibits the

18

kinds of government actions, laws, and regulations that the Founders would have understood to formally establish a state church.

Judges are not historians. Recognizing this limitation, the court turns to Blackstone's *Commentaries* as a short-hand reference to help identify the kinds of laws the Founders may have understood to fall within the core meaning of the Establishment Clause. *See Bruen*, 597 U.S. at 21, 35, 57 (repeatedly citing Blackstone as good historical evidence). Blackstone identifies several "offences against God and religion" recognized in eighteenth century English law. 4 William Blackstone, Commentaries, *40–41. These include "apostacy, or a total renunciation of Christianity, by embracing either a false religion or no religion at all"; "heresy," which involves denial of "some of [Christianity's] essential doctrines publicly and obstinately avowed"; and offenses that "affect the established church … by reviling its ordinances … [or] by non-conformity to its worship." *Id.* at *43–59. Additionally, Blackstone explains that in order to better "secure the established church against perils from non-conformists of all denominations," English law required that elected office holders and civil and military officers take "oaths of allegiance and supremacy" to the Church of England and "receive the sacrament of the Lord's supper according to the usage" of the Church of England. *Id.* at *58–59. Thus, if Blackstone provides a rough guide to the kinds of government actions falling within the core meaning of the Establishment Clause, then at the very least that provision must prohibit (1) punishing people who hold religious beliefs or engage in religious practices outside the teachings of a legally recognized religion, faith, sect, dogma, or church and (2) requiring adherence to certain religious beliefs as a condition for participating in some aspect of public life.

Although the Supreme Court has retreated from any attempt to define how far the Establishment Clause extends beyond these core prohibitions, case law has developed some key

principles. First, "the touchstone for Establishment Clause challenges remains 'the principle that the First Amendment mandates government neutrality between religion and religion, and between religion and nonreligion.'" *Knudtson* v. *Cnty. of Trempealeau*, 982 F.3d 519, 525 (7th Cir. 2020) (quoting *Doe ex rel. Doe* v. *Elmbrook Sch. Dist.*, 687 F.3d 840, 850 (7th Cir. 2012) (en banc); *McCreary Cnty.* v. *ACLU of Ky.*, 545 U.S. 844, 860 (2005)); *see also Larson* v. *Valente*, 456 U.S. 228, 244 (1982) ("The clearest command of the Establishment Clause is that one religious denomination cannot be officially preferred over another."). Second, the government cannot "coerce" anyone to participate in a religious practice. *See Kennedy*, 597 U.S. at 537 (summarizing holdings that government may not "make a religious observance compulsory[,]" "coerce anyone to attend church[,]" or "force citizens to engage in a formal religious exercise") (internal quotation marks and citations omitted). Third, when an Establishment Clause challenge is based on the content of religious messages, such conduct "will not likely establish a constitutional violation" unless part of a "pattern" that "denigrate[s], proselytize[s], or betray[s] an impermissible government purpose[.]" *Town of Greece*, 572 U.S. at 585; *see also Marsh*, 463 U.S. at 794–95 ("The content of the prayer is not of concern to judges where … there is no indication that the prayer opportunity has been exploited to proselytize or advance any one, or to disparage any other, faith or belief."); *Woodring*, 986 F.3d at 995 ("[A] religious monument, symbol, or practice with historical footing might still be unconstitutional if it deviates from the historical tradition by exhibiting intolerance for differing views or discriminatory intent.").

 With these general principles in mind, the court turns to the specific practice at issue in this litigation—legislative prayer. It is well-established that invocations held at the opening of a legislative session do not violate the Establishment Clause if such practices "fit within the

tradition long followed in Congress and the state legislatures." *Am. Legion*, 588 U.S. at 63

(cleaned up) (quoting *Town of Greece*, 572 U.S. at 577). In *Marsh*, the Supreme Court

considered an Establishment Clause challenge to the Nebraska Legislature's practice of

beginning its session with a prayer offered by a paid chaplain. 463 U.S. at 784–85. After

discussing the long practice in Congress of appointing paid chaplains to perform a similar

function—stretching back to before the First Congress approved the Bill of Rights—the Court

concluded that Nebraska's legislative prayer practices posed no threat to the First Amendment.

*Id.* at 786–92. The Court reached this holding despite the facts that "a clergyman of only one

denomination—Presbyterian—ha[d] been selected for 16 years[,]" the chaplain had been "paid at

public expense[,]" and the prayers were only "in the Judeo-Christian tradition." *Id.* at 793.

      Similarly, in *Town of Greece*, the Supreme Court considered an Establishment Clause

challenge against a New York town's practice of beginning its City Council meetings with

invocations delivered by local clergymen. 572 U.S. at 570. As the Court explained:

> The town followed an informal method for selecting prayer givers, all of whom
> were unpaid volunteers. A town employee would call the congregations listed in a
> local directory until she found a minister available for that month's meeting. The
> town eventually compiled a list of willing "board chaplains" who had accepted
> invitations and agreed to return in the future. The town at no point excluded or
> denied an opportunity to a would-be prayer giver. Its leaders maintained that a
> minister or layperson of any persuasion, including an atheist, could give the
> invocation. But nearly all of the congregations in town were Christian; and from
> 1999 to 2007, all of the participating ministers were too.

*Id.* at 571. Eventually, following controversy raised by the lawsuit that would eventually make

its way to the Supreme Court, the town "invited a Jewish layman and the chairman of the local

Baha'i temple to deliver prayers" and accepted the request of a Wiccan priestess to give the

invocation. *Id.* at 572. The Court upheld these practices, concluding that they fit within the

tradition "long followed in Congress" and upheld by *Marsh*. *Id.* at 577–86.

Here, all parties agree that the City's legislative invocation practices fall within the tradition described by *Marsh* and *Town of Greece*. The issue presented here is therefore quite narrow—may the City constitutionally exclude Vavrick from providing an invocation? The City argues that plaintiffs only allege that "Vavrick was not invited to deliver a prayer despite his repeated demands to do so." (Dkt. 11 at 11.) But the complaint actually goes further. It alleges that Vavrick's difficulties getting his request to give an invocation approved began after he provided Rice "additional information about TST and the local congregation." (Dkt. 1 ¶ 20.) The complaint further alleges that the City has permitted clergy from other faiths to give invocations at the same time as it has excluded Vavrick. (*Id.* ¶¶ 17, 31.) Consistent with how the Seventh Circuit evaluates motions to dismiss discrimination claims in other contexts, such allegations are sufficient to support a plausible inference that the City has prevented Vavrick from giving an invocation because of his religious beliefs. (*See id.* ¶¶ 4, 31); *Graham* v. *Bd. of Educ. of the City of Chi.*, 8 F.4th 625, 627 (7th Cir. 2021) (explaining that in employment-discrimination cases, a plaintiff provides sufficient factual allegations to survive a motion to dismiss if she asserts "that she was treated worse because of protected characteristics").

These allegations of exclusion suffice to plausibly allege a violation of the Establishment Clause. Such discrimination could be construed as conditioning eligibility to perform an official public function on holding "mainstream" religious beliefs. Such a religious test, even for guest prayer givers, implicates the core historical meaning of the Establishment Clause. *See* 4 William Blackstone, Commentaries, *58–59. Even if the City's legislative prayer practices do not amount to a religious test, preventing Vavrick from giving an invocation because of his religious beliefs, while allowing clergy from other faiths to give City Council prayers, still violates "the touchstone … principle that the First Amendment mandates government neutrality between

religion and religion, and between religion and nonreligion.'" *Knudtson*, 982 F.3d at 525 (cleaned up) (quoting *Doe ex rel. Doe*, 687 F.3d at 850). Vavrick alleges that his religious beliefs are deeply held, and, indeed, that a different component of the City recognizes him as part of Chicago's faith community. (Dkt. 1 ¶ 15 (the Chicago Police Department "has invited [Vavrick]'s participation in its 'Faith & Blue' initiative.").) The Establishment Clause requires that the City treat Vavrick the same as it would any other clergy member from any other religion. Assuming, therefore, that the City has not scheduled Vavrick to give an invocation because of his religious beliefs, such practice violates the Establishment Clause.

This conclusion is confirmed by *Marsh* and *Town of Greece*. The City relies on the similarities between its legislative prayer practices and those previously upheld by the Supreme Court to insulate itself from plaintiffs' Establishment Clause challenge. But both cases emphasize the importance of facial neutrality and nondiscrimination in selecting who gives a legislative invocation. In *Marsh*, the Supreme Court emphasized that despite the Nebraska state legislature reappointing a single Presbyterian clergyman for 16 years, the evidence indicated these reappointments occurred "because his performance and personal qualities were acceptable to the body appointing him." 463 U.S. at 793. This practice was consistent with the tradition established by the First Congress, for which "[r]eports contemporaneous with the elections [of chaplains] reported only the chaplains' names, and not their religions or church affiliations." *Id.* at 793 n.16. The Court therefore held that Nebraska's practice did not violate the Establishment Clause "[a]bsent proof that the chaplain's reappointment stemmed from an impermissible motive[.]" *Id.* at 793–94.

Similarly, in *Town of Greece*, the court determined that the invitation of a "predominantly Christian set of ministers" to lead prayers before town council meetings did not

violate the Establishment Clause because the town's policy was not discriminatory on its face. 572 U.S. at 585. Because the town "made reasonable efforts to identify all of the congregations located within its borders and represented that it would welcome a prayer by any minister or layman who wished to give one[,]" the fact that "nearly all of the congregations in town turned out to be Christian d[id] not reflect an aversion or bias on the part of town leaders against minority faiths." *Id.* Thus, the Court held that the Establishment Clause does not require a town to promote religious diversity "[s]o long as the town maintains a policy of nondiscrimination[.]" *Id.* at 585–86. These precedents demonstrate the importance of facial nondiscrimination to the Establishment Clause. As long as individual prayer givers are selected for reasons other than their religious beliefs and the selection process "does not reflect an aversion or bias … against minority faiths[,]" the diversity of religious beliefs represented by legislative prayer practices has no relevance to the Establishment Clause. *Id.* at 585. But invocation practices that facially exclude certain prayer givers because of their religious beliefs fall outside the tradition of legislative prayer upheld by the Court in *Marsh* and *Town of Greece*. As explained above, plaintiffs plausibly allege such facial exclusion, and they therefore state a claim for relief.

To be sure, the City cites cases in which courts of appeals have upheld legislative prayer practices that excluded nontheists. (*See* dkt. 11 at 8 (citing *Barker* v. *Conroy*, 921 F.3d 1118, 1128–32 (D.C. Cir. 2019) (holding that U.S. House of Representatives may constitutionally exclude atheists from giving invocation); *see also Fields*, 936 F.3d at 149–58 (holding that the Pennsylvania House of Representative "may intentionally exclude nontheists from offering prayers to open the legislative session"). However, there appears to be a circuit split on this question. *See Williamson* v. *Brevard Cnty.*, 928 F.3d 1296, 1299 (11th Cir. 2019) (holding that selecting "invocation speakers in a way that favors certain monotheistic religions and

categorically excludes from consideration other religions solely based on their belief systems …

runs afoul of the Establishment Clause"); *cf. Freedom From Religion Found., Inc.* v. *Mack*, 49

F.4th 941, 958 (5th Cir. 2022) (constitutionally required "policy of nondiscrimination" satisfied

"so long as (1) members of any faith are free to participate in [the invocation program] and (2)

[the government] selects prayer-givers … without regard for belief"). The Seventh Circuit has

not yet ruled on this issue, but existing precedent suggests it would join the Eleventh Circuit in

holding that nontheists may not be categorically excluded from giving invocations. *See Ctr. for*

*Inquiry*, 758 F.3d at 872–74 (explaining that "[a]dherents to Buddhism, Jainism, Shinto, and

some forms of Taoism call themselves 'religious' despite the absence of gods in their faiths[,]"

collecting cases in which the Supreme Court "has forbidden distinctions between religious and

secular beliefs that hold the same place in adherents' lives" and holding that Indiana's policy of

not allowing secular humanists to solemnize marriages violates the First Amendment.)[6];

*Woodring*, 986 F.3d at 995.

     Furthermore, this court is persuaded that the Eleventh Circuit's holding prohibiting

discrimination between theists and nontheists more faithfully applies *Marsh* and *Town of Greece*.

In the first place, the decisions of the Third and D.C. Circuits upholding the exclusion of

nontheists both depend on analyzing the "religious" nature of prayer and its legislative tradition.

*See Fields*, 936 F.3d at 149–58; *Barker*, 921 F.3d at 1128–32. Excluding nontheists via such

analysis, however, requires either explicit discussion of or implicit assumptions about the ability

of nontheists to give prayers conforming to such traditions. In other words, such exclusions

depend inherently on the content of religious belief—and enforcing such restrictions puts

---

[6] In *Center for Inquiry*, Indiana cited *Marsh* and *Town of Greece* in support of the proposition that "states may support religious views without extending similar favors to non-religious groups." 758 F.3d at 874. The Seventh Circuit expressed no opinion regarding this argument, choosing instead to distinguish *Marsh* and *Town of Greece* based on the different context presented by legislative prayer. *Id.*

governments (including courts) in the position of deciding whether a particular belief system is sufficiently "religious." Such restrictions therefore "force the legislatures that sponsor prayers and the courts that are asked to decide these cases to act as supervisors and censors of religious speech." *Town of Greece*, 572 U.S. at 581. This concern is not hyperbole. For example, although some believers in "Buddhism, Jainism, Shinto, and some forms of Taoism" may "call themselves 'religious' despite the absence of gods in their faiths[,]" *Ctr. for Inquiry*, 758 F.3d at 872, the Third Circuit went out of its way to define Buddhism in a manner that would avoid the "unconscionable" outcome that the court's decision would allow for the exclusion of Buddhists as legislative prayer-givers, *Fields*, 936 F.3d at 155 (relying on the Dalai Lama's 2014 invocation before U.S. Senate in which he exhorted listeners to "pray to Buddha and all other gods"). If the First Amendment commands anything, it is that governments—including courts—must play no role in defining systems of religious belief or making policy decisions based on the tenets they determine particular belief systems must follow. *See Town of Greece*, 572 U.S. at 582 ("The First Amendment is not a majority rule, and government may not seek to define permissible categories of religious speech. Once it invites prayer into the public sphere, government must permit a prayer giver to address his or her own God or gods as conscience dictates[.]"). Limiting invocations to theistic prayers and prayer givers inevitably and dangerously crosses this line.

Furthermore, such restrictions risk confusing the deeply felt and longstanding religious convictions many Americans have held since before the Founding with some kind of status for religion in the structure of our constitutional democracy. In *Barker* v. *Conroy*, for example, the D.C. Circuit began its tradition analysis by quoting Supreme Court dicta that "[w]e are a religious people whose institutions presuppose a Supreme Being." 921 F.3d at 1130 (quoting

*Marsh*, 463 U.S. at 792; *Zorach* v. *Clauson*, 343 U.S. 306, 313 (1952)). Although poetic, this assertion is demonstrably false with regard to the institutions of the federal government. The Constitutional Convention did not open its sessions with invocations or prayers, *Marsh*, 463 U.S. at 787, and the text of the Constitution makes no mention of "God," "Creator," "Supreme Being," or other similar terms for divinity. Indeed, the word "religion" occurs only twice: first, when the Constitution makes clear that "no religious Test shall ever be required as a Qualification to any Office or public Trust under the United States[,]" and second, when guaranteeing that "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof." U.S. Const. art. VI; *id.* amend. I. Americans may very well be a religious people, but our institutions presuppose only that how or if we practice such religious beliefs lies entirely outside the reach of government. Courts should not analyze tradition in a way that undermines this key promise of American constitutional liberty.

At this stage in the litigation, however, the picture of the City's invocation policies is too halting and uncertain to allow the fulsome and rigorous comparison to historical tradition envisioned by *Marsh* and *Town of Greece*. For that matter, it is not even clear that the City's policy draws any divide between theistic and nontheistic prayer givers. (*See* dkt. 11 at 9–10 ("If anything, the City's practice is more inclusive than those the Supreme Court and circuit courts have approved … City Council meetings have opened with invocations by faith leaders from Christian, Jewish, Muslim, and Buddhist congregations.").) And, at the motion to dismiss stage, neither party has proffered historical evidence beyond simply pointing to *Marsh* and *Town of Greece*. Any further analysis requires consideration of a fully developed factual record.

Plaintiffs have therefore plausibly alleged a violation of the Establishment Clause.[7]

Whether the facts will prove the accuracy of this assertion is a question for another day. To

succeed, plaintiffs will essentially need to demonstrate that the City excluded Vavrick because of

his religious beliefs. *See, e.g.*, *Williamson*, 928 F.3d at 1315–16 (holding that the Establishment

Clause is violated when government officials "consciously" hold and act "upon views about

which religions and types of religious beliefs [a]re the right kind for invocations and which [a]re

not[,]" but is not violated due to the lack of "a formal, written policy" or the discretion given to

government officials to select speakers.) The evidence ultimately may not provide such proof. In

the meantime, the case should proceed to discovery, and the parties should develop a detailed

record regarding the City's legislative invocation practices. Only then can questions regarding

application of the Establishment Clause be fully resolved.

## II.     Motion for Preliminary Injunction

Finally, the court easily denies plaintiffs' motion for preliminary injunction. (Dkt. 7.) As

explained above, plaintiffs' *Monell* municipal liability claim has four elements. A plaintiff must

show "(1) she was deprived of a constitutional right; (2) the deprivation can be traced 'to some

municipal action (i.e., 'a policy or custom'), such that the challenged conduct is properly

attributable to the municipality itself'; (3) 'the policy or custom demonstrates municipal fault,

i.e., deliberate indifference'; and (4) 'the municipal action was the moving force behind the

federal-rights violation.'" *Thomas*, 74 F.4th at 524 (quoting *Dean*, 18 F.4th at 235). Additionally,

under *Monell*, courts have recognized "three types of municipal action that can support

---

[7] The parties also exchange arguments about whether "the invocation practice has favored or disparaged anyone's faith or beliefs." (Dkt. 11 at 10; *see also* dkt. 20 at 18–21; dkt. 23 at 8–11.) To the extent these arguments regard the Establishment Clause's nondiscrimination requirement, the court has adequately dealt with them throughout this opinion. To the extent they relate to the actual content of prayers given before the City Council, the complaint contains no allegations regarding that issue. The issue is therefore not properly before the court on a motion to dismiss.

municipal liability under § 1983: '(1) an express policy that causes a constitutional deprivation when enforced; (2) a widespread practice that is so permanent and well-settled that it constitutes a custom or practice; or (3) an allegation that the constitutional injury was caused by a person with final policymaking authority.'" *Bohanon* v. *City of Indianapolis*, 46 F. 4th 669, 675 (7th Cir. 2022) (quoting *Spiegel* v. *McClintic*, 916 F.3d 611, 617 (7th Cir. 2019)).

Here, plaintiffs' motion focuses entirely on the deprivation of a constitutional right element of their *Monell* claim. They make no argument as to the other three elements of their claim, nor do they explain how getting their requests perpetually kicked down the road by Rice and Garcia constitutes "municipal action" for which the court can hold the City liable by imposing an injunction. Plaintiffs have therefore waived such arguments. *See Accident Fund Ins. Co. of Am.* v. *Custom Mech. Constr.*, 49 F.4th 1100, 1108 (7th Cir. 2022) (arguments not raised in opening brief are waived). Because plaintiffs consequently make no showing as to essential elements of their claim, they have not demonstrated any likelihood of success on the merits and the analysis need go no further. *See Braam*, 37 F.4th at 1272 ("The first step in the analysis—the plaintiff's likelihood of success on the merits—is often decisive.")

## **CONCLUSION AND ORDER**

For the foregoing reasons, the City's motion to dismiss (dkt. 11) is granted without prejudice to repleading with respect to plaintiffs' Free Speech Clause claim and denied with respect to plaintiffs' Establishment Clause claim. Plaintiffs' motion for preliminary injunction (dkt. 7) is denied.

Date: March 31, 2024

_____
U.S. District Judge Joan H. Lefkow